Giovanni Orantes, Esq. 190060
THE ORANTES LAW FIRM, P.C.
3435 Wilshire Blvd. – Suite 2920
Los Angeles, CA 90010
Tel: 213-389-4362
Fax: 877-789-5776
go@gobklaw.com

General Insolvency Counsel for Debtor
And Debtor-In-Possession

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

In re

Jong Uk Byun,

           Debtor and
           Debtor-In-Possession.

Case No. 2:20-bk-17433-VZ

Chapter 11 Proceeding

**CHAPTER 11 STATUS REPORT;
SUPPORTING DECLARATIONS**

**HEARING**
**Date:**    October 22, 2020
**Time:**    9:30 a.m.
**Place:**   Courtroom:1368
          255 E Temple St.,
          Los Angeles, CA 90012

    Jong Uk Byun, the debtor and debtor-in-possession in the above Chapter 11 proceeding (the "Debtor"), hereby submits his Status Report as ordered by the Court:

I.

**General Description of the Debtor.**

    Jong Uk Byun ("Debtor") commenced his bankruptcy case on August 14, 2020 (the "Petition Date").

    The Debtor is an individual, 69 years of age.  The Debtor owns real property which he is currently partially renting to businesses.  He does not own a home.  He also owns 100% of Central

1    Metal, Inc., ("CMI") which he formed in 1993, but does not currently conduct business activities

2    other than sub-renting its locations.  He operated CMI ever since 1993 until recently.

3            The Debtor's troubles commenced when CMI's largest customer Hyundai Steel Company,

4    Ltd. ("Hyundai") breached its contract with CMI.  From 2007 through mid-2016, CMI sold

5    Hyundai more than $180 million in recycled materials pursuant to a Memorandum of

6    Understanding.  Despite promises to the contrary, which caused CMI to purchase additional

7    material handling equipment and expanding its business, Hyundai stopped buying products from

8    CMI in 2016 without any formal notice. In breach of its promises to purchase 1.12 million tons of

9    scrap metal since 2008, Hyundai barely purchased approximately 334,400 tons of scrap metal.  As

10   a result of Hyundai Steel's breach of its promises, CMI was never able to recover financially. CMI

11   and, by extension, the Debtor have lost approximately $32 Million from Hyundai's failure to

12   purchase 140,000 tons of scrap metal annually. One important detail here is that Hyundai

13   discontinued performing on its obligations to CMI when it made an equivalent promise to Prime

14   Metals U.S.A., Inc. ("Prime Metals) in exchange for the purchase by Prime Metals of certain

15   mortgages against the Debtor's real properties. Hyundai had previously agreed to purchase these

16   mortgages (and be flexible regarding collection) as compensation for Hyundai's breach of

17   purchase agreements with CMI in 2008 (the "Notes").

18           Such Notes are the basis for Hyundai's attempt to foreclose on the Debtor's real properties

19   on August 17, 2020.  In short, Hyundai breached agreements with CMI, which caused CMI to

20   incur losses of tens of millions of dollars in depreciating scrap metal and investments in equipment

21   and expansion of operations. Hyundai then purchased the Notes; however, since Hyundai then

22   continued breaching its promises to buy scrap metal, both CMI and the Debtor were unable to

23   perform under the Notes. To add insult to injury, Hyundai now is attempting to foreclose on the

24   Debtor's real properties even though the Notes are the subject of an action to foreclose on the

25   Debtor's real properties on August 17, 2020.

26           Again, Central Metal's largest customer was, until approximately mid-2016, Hyundai.

27   From 2007 through mid-2016, Central Metal sold Hyundai more than $180 million in recycled

28   materials pursuant to a Memorandum of Understanding.  Despite promises to the contrary which

1   caused Central Metal to purchase additional material handling equipment and expanding its

2   business, Hyundai stopped buying product from Central Metal in 2016 without any formal notice.

3   In breach of its promises to purchase 1.12 Million tons of scrap metal since 2008, Hyundai barely

4   purchased approximately 334,400 tons of scrap metal.  As a result of Hyundai Steel's breach of its

5   promises, Central Metal was never able to recover financially.  Central Metal and, by extension,

6   the Debtor have lost approximately $32 Million from Hyundai's failure to purchase 140,000 tons

7   of scrap metal annually. One important detail here is that Hyundai discontinued performing on its

8   obligations to Central Metal when it made an equivalent promise to Prime Metals, Inc. in exchange

9   for the purchase by Prime Metals, Inc. of certain mortgages against  the Debtor's real properties

10  which Hyundai had previously agreed to purchase (and be flexible regarding collection) in

11  compensation for Hyundai's breach of purchase agreements with Central Metal in 2008 ("Notes")

12  because Hyundai owed Central Metal approximately no less than what was owed on the Notes.

13  However, such Notes were the basis for the attempt to foreclose on the Debtor's real properties on

14  August 17, 2020.

15          The Court should note that in the Debtor's previous 2018 bankruptcy case he attempted to

16  sell the 8201 Santa Fe Ave. Huntington Park, CA 90255 property ("Santa Fe Property"). The

17  Debtor had been in contact with a broker that had obtained an offer for $28 Million. This offer was

18  presented to Hyundai, but, as detailed in the Declaration of Kirk Garabedian, it had to be cancelled

19  due to the various environmental challenges with the EPA and the lack of clarity at the time as

20  well as the unresolved and pending litigation/arbitration matters. The buyers felt that it was just too

21  complicated and risky to spend time and resources for further investigations; additionally, they

22  were concerned the property would not be deliverable given the legal complications with Hyundai

23  (and its refusal to cooperate) and, therefore, the buyers decided to cancel escrow. In Kirk

24  Garabedian's opinion, given the further clarity of the environmental situation now, and the

25  published reports/testing conducted by the EPA, he believes that the Debtor is in a much stronger

26  position to be able to garner a similar offer with better terms and conditions. The Debtor has

27  continued to seek purchase offers but Hyundai has never agreed to cooperate with a sale.

28  Similarly, the Debtor had obtained financing for the Santa Fe Property and made an offer of $21

1    Million to Hyundai, but Hyundai also rejected that offer.

2         In short, Hyundai breached agreements with Central Metal, which caused Central Metal to

3    incur losses of tens of millions of dollars in depreciating scrap metal and investments in equipment

4    and expansion of operations. Hyundai then purchased the Notes; however, since Hyundai then

5    continued breaching its promises to buy scrap metal, both Central Metal and the Debtor were

6    unable to perform under the Notes. To add insult to injury, Hyundai now is attempting to foreclose

7    on the Debtor's real properties even though the Notes are the subject of an action to recover them

8    by Richard Marshack, as Chapter 7 Trustee for Prime Metals, U.S.A., Inc., another pawn in

9    Hyundai's game of deceit and bad faith. The Debtor intends to explore prosecuting litigation

10   against Hyundai as part of this bankruptcy proceeding.

11        For now, again, the Debtor filed this personal chapter 11 case to stop a foreclosure sale of

12   the Debtor's real property by the senior deed of trust holder, Hyundai, so that he could invoke the

13   bankruptcy laws to reorganize such debts as well as the debts of several other creditors who may

14   otherwise get nothing from a foreclosure. The Debtor could not resolve this situation outside of

15   Bankruptcy because Hyundai has refused to work with the Debtor despite the many delays injected

16   into the process by the COVID-19 Pandemic from which this City and country are still suffering

17   and it became clear that the Debtor does have the wherewithal to propose a confirmable plan

18   because of all the rental agreements he obtained that allow him to confirm a Chapter 11 plan even

19   if refinancing or payoff takes more time.

20        The foreclosure sale was set for August 17, 2020. The Debtor had previously listed the his

21   Los Angeles properties for sale and secured three buyers to purchase all four properties for $34.8

22   Million, which is less than what the Debtor believes he would get now that the EPA has found

23   little contamination in the Debtor's properties if given sufficient time for marketing and due

24   diligence by potential purchasers. However, not even those sales could close before August 17,

25   2020 and Hyundai refused to give the Debtor any further extension even though the total sales

26   price exceeds Hyundai's claims of approximately $24 Million by approximately $10 Million.

27   When the Debtor was unable to convince either Hyundai or the Superior Court for the County of Los

28   Angeles to continue the sale, he had to file the bankruptcy petition. However, the Debtor is confident

1   that he can propose a feasible plan of reorganization this time as the Debtor's circumstances have

2   changed drastically for the better. The equity and the rents the Debtor's properties generate can

3   enable him to fund payment of all of the Debtor's creditors, not only whichever creditor can win

4   the race to dismember the Debtor's assets leaving other creditors unpaid or the Debtor's assets

5   unfairly exhausted, which an orderly Chapter 11 reorganization can facilitate.

6    Unlike in the Debtor's previous case, this time he has rental income which should enable

7   him to fund a plan of reorganization, especially in light of the historically low interest rates

8   prevalent at this time, which would impact the amounts payable to creditors as well as the cost of

9   borrowing to take out the existing claimholders through a refinancing in the future. True and

10  correct copies of the current lease agreements on the Debtor's properties are attached as

11  Exhibit "1" with a summary page to the Debtor's declaration.

12   The Debtor's real estate assets have significant equity and, as an appraiser the Debtor

13  retained to produce appraisal reports testifies, are not decreasing in value. With respect to the

14  Debtor's real property, he is familiar with the values of real assets where his real properties are

15  located and have even received and considered recent purchase offers, which he believes to be

16  true, and provide values herein on such basis as well as based on the valuations of the appraiser.

17  The Debtor owns real estate with values and claims against them as set forth in that chart attached

18  to the Debtor's declaration as Exhibit "2", which is hereby incorporated by reference as if set forth

19  in full herein (the "Equity Chart"). As set forth in the Equity Chart, which the Debtor caused to be

20  prepared, all the properties have a combined value of approximately $43,150,000 and all the debts

21  add up to approximately $30,537,420.07 (with some stated at the original amount secured, but may

22  be different now), which results in a global equity amount of $12,612,579.98.

23   In summary, the Debtor's good faith in filing and prosecuting the present Chapter 11

24  bankruptcy case is shown here because since the Debtor's last case was dismissed, he has

25  endeavored to resolve the financial issues that led to the Debtor's need for reorganization. Among

26  other things, the Debtor allowed one of his properties to be foreclosed, sold one of his properties

27  for $ 2,250,000.00 and paid down claims, including property taxes by $2,239,921.37 on or

28  approximately February 6, 2020. The Debtor also, again, sought refinancing of the largest claim

1   against him, which is allegedly currently held by Hyundai Steel Company and is likely to secure

2   bridge financing, if needed. However, most importantly, he has entered into lease agreements for

3   his real estate assets which currently are set to generate over $173,276.61 per month (which is set

4   to increase to $195,165.84 starting in November 2020) and may increase to $262,906.26 after

5   August 2021 when the tenant of the 8021 Santa Fe Avenue property obtains a full conditional use

6   permit, which should now enable the Debtor to be able to fund a Chapter 11 plan of

7   reorganization, especially in light of the historically low interest in effect now and for the next year

8   or longer. A 30 year mortgage to repay the aforementioned total of $30,537,420.07 would have a

9   monthly payment of $145,790.30 with 4% interest or $150,225.80 at 4.25%, for example.  It

10  should also be highlighted that the alleged holder of the vast majority of his debt (previously

11  defined as "Notes") is a defendant in an action by Chapter 7 Trustee Richard Marshack on behalf

12  of the previous holder of the Notes, Prime Metals, U.S.A., Inc. by which Trustee Marshack seeks,

13  among other things, to set aside as preferential or fraudulent, the transfer of the Notes to Hyundai.

14          In addition, the Debtor is exploring filing an adversary proceeding to cancel or reduce such

15  Notes and/or an award of damages under theories of antitrust/unfair competition, and fraud, among

16  others. **Importantly**, too, the Environmental Protection Agency ("EPA") has been carrying out its

17  analysis of the Debtor's properties and its conclusion is that the "EPA found little chemical

18  contamination on your facility; ..."  The Debtor believes that once the COVID-19 threat is in better

19  control and any exposure found regarding the EPA analysis is further clarified, terms for

20  refinancing may be relaxed, especially when he has available to show a history of receiving rental

21  income sufficient to service a loan. Attached to the Debtor's declaration as Exhibit "3" is a true

22  and correct copy of the quoted e-mail message he received from Matt Mitguard of the EPA.  While

23  the same email goes on to say "however, the contaminated debris pile on site suggested that over

24  time, contamination from the facility, from similar debris piles, may have been dispersed into area

25  neighborhoods," which will require further assessment to be delayed until 2021, the current

26  findings makes his largest property more valuable and easier to rent and/or refinance. Marvin

27  Sasche submitted his declaration authenticating his EPA Site Investigation History, containing the

28  above-referenced e-mail message as part of his Declaration in support of the Debtor's Opposition

To Motion For Relief From The Automatic Stay Under 11 U.S.C. § 362 (Docket No. 75), among others, and is hereby incorporated by reference.

Thus, the Debtor's circumstances are now vastly different from the situation that led to having the Debtor's previous Chapter 11 case dismissed. The Debtor's financial outlook is now much better than during the pendency of the previous case. Attached to the Debtor's declaration as Exhibit "4" is a true and correct copy of his monthly projected income. Additionally, attached to the Debtor's declaration as Exhibit "5" is true and correct claims list, which calculates what the estimated amount of his monthly plan payments would be.

## II.

## Disclosure Statement Filing Status

The Debtor is in the process of preparing his Disclosure Statement and Plan, but the tax season (some returns are due on October 15) prevents his accountant from completing certain required financial statements at this time. He believes that he will be able to prepare and file a combined Disclosure Statement and Chapter 11 plan in this case soon after the claims bar date period has expired, but may file one sooner, if possible.

The main unresolved issue in this case is Hyundai's Motion for Relief from Stay Under 11 U.S.C. § 362 (Docket No. 17).

## III.

## Proposed Bar Date and Deadline for Claim Objections

The Debtor requests that the Court issue a deadline to file proof of claims. Deadline should be December 15, 2020. The Debtor does not request that a deadline to have objections to claims be set.

## IV.

## Debtor has performed all duties under 11 U.S.C. §§ 521, 1106 and 1107

The Debtor has performed all his duties under 11 U.S.C. §§ 521, 1106 and 1107.

<div align="center">

**V.**

**Debtor's Post-Petition Operations**

</div>

The Debtor is currently only renting his properties and depositing the rent in segregated Debtor-In- Possession accounts. He is not using cash collateral but has filed a motion to use it, which is set to be heard on October 20, 2020 at 11:00 a.m.

<div align="center">

**VI.**

**Professionals**

</div>

At this time, the Debtor has only hired The Orantes Law Firm, P.C. ("the "Firm"), as his general insolvency counsel.  The Firm's employment application was filed on September 4, 2020 as Docket No. 36. On September 29, 2020, the Court entered that Order Granting Motion in Individual Chapter 11 Case to Authorize Debtor-in-Possession to Employ General Counsel (Docket No. 58).

The Debtor will be filing an application to employ a professional other than general bankruptcy counsel for Hyoung Jin Park (CPA) for the Debtor's accounting needs.

<div align="center">

**VI.**

**TIMING FOR FILING OF PLAN AND DISCLOSURE STATEMENT**

</div>

Again, the Debtor can file his Disclosure Statement and Plan soon after the claims bar date expires, but may file it sooner, if possible. The Debtor believes that there will be a distribution to general unsecured creditors in this case.

The Debtor intends to strive diligently to reorganize his financial affairs as expeditiously as possible and hopes to have his plan of reorganization confirmed as expeditiously as possible.


DATED:  October 8, 2020

<div align="right">

By: /s/Giovanni Orantes
     Giovanni Orantes, Esq.
General Insolvency Counsel for Debtor and
Debtor-in-Possession

</div>

### DECLARATION OF JONG UK BYUN

I, Jong Uk Byun, hereby declare and state as follows:

1.      I am the Debtor (hereinafter the "Debtor") in the case under Chapter 11 of the Bankruptcy Code, Case No. 2:20-bk-17433-VZ ("Case"). Except when based on information and belief, I make this declaration based on facts within my personal knowledge and if called as a witness, could and would testify thereto.

2.      I caused to be filed the present case for relief under Chapter 11 on August 14, 2020 (the "Petition Date"). I believe it is important to explain the conditions that required my filing for relief.

3.      I am a single individual, 69 years of age.  I came to the United States from Korea in 1992 and started engaging in the metal recycling business the following year. I formed Central Metal, Inc. ("Central Metal") in 1993 and operated Central Metal until recently.  Central Metal is a "C" corporation for tax purposes. As further explained below, Central Metal could not continue to operate in the metal recycling business because its operations and capacity had been customized for the needs of Hyundai Steel Company, Ltd. ("Hyundai") (for example, its large capacity and set-up for container shipping), which had entered into an exclusivity agreement with Central Metal in 2005, but breached its agreement to purchase from Central Metal repeatedly, including in 2008, 2009 and then in 2016. Hyndai's breaches led Central Metal to switch its operations and it is currently in the business of renting real property assets that I rent to it.  Nevertheless, I continue to strive to identify new business opportunities and plan to exercise my right to engage in business to enhance my financial wherewithal, as necessary.

4.      Central Metal filed a chapter 11 petition on January 8, 2010,  Case No. 2:10-bk l0642-VZ, *In re* Central Metal, Inc., and was successful in getting a Plan of Reorganization confirmed on November 2, 2010.  A discharge was entered on July 5, 2011.

5.      I filed a personal chapter 11 case with my wife (now ex-wife) at about the same time, Case No. 2:10-bk-11241-VZ.  I was also successful in getting a chapter 11 plan confirmed by Order entered on March 9, 2011.  A discharge was entered on June 24, 2011.

6.      I rent. I do not own a home.

7.      Again, Central Metal's largest customer was, until approximately mid-2016,

Hyundai. From 2007 through mid-2016, Central Metal sold Hyundai more than $180 million in

recycled materials pursuant to a Memorandum of Understanding.  Despite promises to the contrary

which caused Central Metal to purchase additional material handling equipment and expanding its

business, Hyundai stopped buying product from Central Metal in 2016 without any formal notice.

In breach of its promises to purchase 1.12 Million tons of scrap metal since 2008, Hyundai barely

purchased approximately 334,400 tons of scrap metal.  As a result of Hyundai Steel's breach of its

promises, Central Metal was never able to recover financially.  Central Metal and, by extension, I

have lost approximately $32 Million from Hyundai's failure to purchase 140,000 tons of scrap

metal annually. One important detail here is that Hyundai discontinued performing on its

obligations to Central Metal when it made an equivalent promise to Prime Metals, Inc. in exchange

for the purchase by Prime Metals, Inc. of certain mortgages against my real properties which

Hyundai had previously agreed to purchase (and be flexible regarding collection) in compensation

for Hyundai's breach of purchase agreements with Central Metal in 2008 ("Notes") because

Hyundai owed Central Metal approximately no less than what was owed on the Notes.  However,

such Notes were the basis for the attempt to foreclose on my real properties on August 17, 2020.

8.      The Court should note that in my previous 2018 bankruptcy case I attempted to sell

the 8201 Santa Fe Ave. Huntington Park, CA 90255 property ("Santa Fe Property"). I had been in

contact with a broker that had obtained an offer for $28 Million. This offer was presented to

Hyundai, but, as detailed in the Declaration of Kirk Garabedian, it had to be cancelled due to the

various environmental challenges with the EPA and the lack of clarity at the time as well as the

unresolved and pending litigation/arbitration matters. The buyers felt that it was just too

complicated and risky to spend time and resources for further investigations; additionally they

were concerned the property would not be deliverable given the legal complications with Hyundai

(and its refusal to cooperate) and, therefore, the buyers decided to cancel escrow. In his opinion,

given the further clarity of the environmental situation now, and the published reports/testing

conducted by the EPA, I am in a much stronger position to be able to garner a similar offer with

better terms and conditions. I have continued to seek purchase offers but Hyundai has never agreed

1    to cooperate with a sale. Similarly, I had obtained financing for the Santa Fe Property and made an

2    offer of $21 Million to Hyundai, but Hyundai also rejected that offer.

3        9.    In short, Hyundai breached agreements with Central Metal, which caused Central

4    Metal to incur losses of tens of millions of dollars in depreciating scrap metal and investments in

5    equipment and expansion of operations. Hyundai then purchased the Notes; however, since

6    Hyundai then continued breaching its promises to buy scrap metal, both Central Metal and I were

7    unable to perform under the Notes. To add insult to injury, Hyundai now is attempting to foreclose

8    on my real properties even though the Notes are the subject of an action to recover them by

9    Richard Marshack, as Chapter 7 Trustee for Prime Metals, U.S.A., Inc., another pawn in

10    Hyundai's game of deceit and bad faith. I intend to explore prosecuting litigation against Hyundai

11    as part of this bankruptcy proceeding.

12        10.    For now, again, I filed this personal chapter 11 case to stop a foreclosure sale of my

13    real property by the senior deed of trust holder, Hyundai, so that I could invoke the bankruptcy

14    laws to reorganize such debts as well as the debts of several other creditors who may otherwise get

15    nothing from a foreclosure. I could not resolve this situation outside of Bankruptcy because

16    Hyundai has refused to work with me despite the many delays injected into the process by the

17    COVID-19 Pandemic from which this City and country are still suffering and it became clear that I

18    do have the wherewithal to propose a confirmable plan because of all the rental agreements I

19    obtained that allow me to confirm a Chapter 11 plan even if refinancing or payoff takes more time.

20        11.    The foreclosure sale was set for August 17, 2020. I had previously listed my Los

21    Angeles properties for sale and secured three buyers to purchase all four properties for $34.8

22    Million, which is less than what I believe I would get now that the EPA has found little

23    contamination in my properties if given sufficient time for marketing and due diligence by

24    potential purchasers. However, not even those sales could close before August 17, 2020 and

25    Hyundai refused to give me any further extension even though the total sales price exceeds

26    Hyundai's claims of approximately $24 Million by approximately $10 Million. When I was unable

27    to convince either Hyundai or the Superior Court for the County of Los Angeles to continue the sale, I

28

1  had to file the bankruptcy petition. However, I am confident that I can propose a feasible plan of

2  reorganization this time as my circumstances have changed drastically for the better.

3    12.    This equity and the rents my properties generate can enable me to fund payment of

4  all of my creditors, not only whichever creditor can win the race to dismember my assets leaving

5  other creditors unpaid or my assets unfairly exhausted, which an orderly Chapter 11 reorganization

6  can facilitate.

7    13.    Unlike in my previous case, this time I have rental income which should enable me

8  to fund a plan of reorganization, especially in light of the historically low interest rates prevalent at

9  this time, which would impact the amounts payable to creditors as well as the cost of borrowing to

10  take out the existing claimholders through a refinancing in the future. True and correct copies of

11  the current lease agreements on my properties are attached as Exhibit "1" with a summary page.

12    14.    My real estate assets have significant equity and, as an appraiser I retained to

13  produce appraisal reports testifies, are not decreasing in value.  I am submitting declarations from

14  an appraiser for real estate assets concurrently. With respect to my real property, I am familiar with

15  the values of real assets where my real properties are located and have even received and

16  considered recent purchase offers, which I believe to be true, and provide values herein on such

17  basis as well as based on the valuations of the appraiser. I own real estate with values and claims

18  against them as set forth in that chart attached hereto as Exhibit "2", which is hereby incorporated

19  by reference as if set forth in full herein (the "Equity Chart").  As set forth in the Equity Chart,

20  which I caused to be prepared, all the properties have a combined value of approximately

21  $43,150,000 and all the debts add up to approximately $30,537,420.07 (with some stated at the

22  original amount secured, but may be different now), which results in a global equity amount of

23  $12,612,579.98.

24    15.    In summary, my good faith in filing and prosecuting the present Chapter 11

25  bankruptcy case is shown here because since my last case was dismissed, I have endeavored to

26  resolve the financial issues that led to my need for reorganization. Among other things, I allowed

27  one of my properties to be foreclosed, sold one of my properties for $ 2,250,000.00 and paid down

28  claims, including property taxes by $2,239,921.37 on or approximately February 6, 2020. I also,

1    again, sought refinancing of the largest claim against me, which is allegedly currently held by

2    Hyundai Steel Company and am likely to secure bridge financing, if needed. However, most

3    importantly, I have entered into lease agreements for my real estate assets which currently are set

4    to generate over $173,276.61per month (which is set to increase to $195,165.84 starting in

5    November 2020) and may increase to $262,906.26 after August 2021 when the tenant of my 8021

6    Santa Fe Avenue property obtains a full conditional use permit, which should now enable me to be

7    able to fund a Chapter 11 plan of reorganization, especially in light of the historically low interest

8    in effect now and for the next year or longer. A 30 year mortgage to repay the aforementioned total

9    of $30,537,420.07 would have a monthly payment of $145,790.30 with 4% interest or $150,225.80

10   at 4.25%, for example.  It should also be highlighted that the alleged holder of the vast majority of

11   my debt (previously defined as "Notes") is a defendant in an action by Chapter 7 Trustee Richard

12   Marshack on behalf of the previous holder of the Notes, Prime Metals, U.S.A., Inc. by which

13   Trustee Marshack seeks, among other things, to set aside as preferential or fraudulent, the transfer

14   of the Notes to Hyundai. In addition, I am exploring filing an adversary proceeding to cancel or

15   reduce such Notes and/or an award of damages under theories of antitrust/unfair competition, and

16   fraud, among others.

17          16.    Importantly, too, the Environmental Protection Agency ("EPA") has been carrying

18   out its analysis of my properties and its conclusion is that the "EPA found little chemical

19   contamination on your facility; ..."  I believe that once the COVID-19 threat is in better control and

20   any exposure found regarding the EPA analysis is further clarified, terms for refinancing may be

21   relaxed, especially when I have available to show a history of receiving rental income sufficient to

22   service a loan. Attached hereto as Exhibit "3" is a true and correct copy of the quoted e-mail

23   message I received from Matt Mitguard of the EPA.  While the same email goes on to say

24   "however, the contaminated debris pile on site suggested that over time, contamination from the

25   facility, from similar debris piles, may have been dispersed into area neighborhoods," which will

26   require further assessment to be delayed until 2021, the current findings make my largest property

27   more valuable and easier to rent and/or refinance. Marvin Sasche submitted his declaration

28   authenticating his EPA Site Investigation History, containing the above-referenced e-mail message

1    as part of his Declaration in support of the Debtor's Opposition To Motion For Relief From The

2    Automatic Stay Under 11 U.S.C. § 362 (Docket No. 75), among others, and is hereby incorporated

3    by reference.

4         17.    Thus, my circumstances are now vastly different from the situation that led to

5    having my previous Chapter 11 case dismissed. My financial outlook is now much better than

6    during the pendency of the previous case.

7         18.    Attached hereto as Exhibit "4" is a true and correct copy of my monthly projected

8    income.

9         19.    Additionally, a true and correct claims list for my case, which calculates the

10   estimated amount of my monthly plan payments, is attached hereto as Exhibit "5".

11        I declare under penalty of perjury under the laws of the United States of America that the

12   foregoing is true and correct and that this declaration was executed on October 8, 2020 in Los

13   Angeles, California.

14

15                                                      Jong Uk Byun

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit "1"

# Lease Agreement Chart

**1)**

| Property: 2445 S. Alameda Street | | | |
|---|---|---|---|
| **Tenant** | **Term** | **Rent Amount** | **Lease Agreement** |
| Kim Ki Joong | Month to Month | $2,500.00 | Attached as Exhibit "A" |
| Allison & Diesel Transmission Parts | 4/10/2020-4/10/2025 | $12,690.00 | Attached as Exhibit "B" |

**2)**

| Property: 8201 Santa Fe Ave. | | | |
|---|---|---|---|
| **Tenant** | **Term** | **Rent Amount** | **Lease Agreement** |
| *Fleet Yards, Inc. | 8/01/2020-8/14/2025 | $94,286.61 | Attached as Exhibit "C" |

\* Fleet Yards, Inc. is in the process of obtaining a CUP permit, which when obtained will increase the amount of space they use at the Santa Fe property (currently 285,717sq/ft at $ 0.33), and **increase** the rent amount by **$67,740.42** (for an additional 205,274 sq/ft).

**3)**

| Property: 2203 S. Alameda St. | | | |
|---|---|---|---|
| **Tenant** | **Term** | **Rent Amount** | **Lease Agreement** |
| Union CM, Inc. | 11/01/2019-11/01/2024 | $41,000.00 | Attached as Exhibit "D" |

**4)**

| Property: 1736 E. 24th St. | | | |
|---|---|---|---|
| **Tenant** | **Term** | **Rent Amount** | **Lease Agreement** |
| Union CM, Inc. | 11/01/2019-11/01/2024 | $20,800.00 | Attached as Exhibit "E" |

**5)**

| Property: 24399 State Highway 58 | | | |
|---|---|---|---|
| **Tenant** | **Term** | **Rent Amount** | **Lease Agreement** |
| Union CM, Inc. | 11/01/2019-11/01/2024 | $2,000.00 | Attached as Exhibit "F" |

| | | |
|---|---|---|
| **Rents Total:** | **$173,276.61** | |
| Fleet Yards Inc. will be signing an addendum adding to their rented space by 66,331 sq. ft. at $0.33 per sq/ft at the 8201 Santa Fe property. | $21,889.23 | |
| **Grand total:** | **$195,165.84** | |
| *Projected rent increase from Fleet yards rent space in approximately 12 months when the tenants obtains a full conditional use permit: | $67,740.42 | |
| Projected Rents Tota | $262,906.26 | |

# Exhibit "A"

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., of 2203 S. Alameda St., Los Angeles, CA 90058 hereinafter referred to as "Lessor", and _____
_____, of _____
_____, hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.     **DESCRIPTION OF LEASED PREMISES**: The Lessor agrees to lease to the Lessee the following described: <u>2418.25 net SQUARE FEET (SF) OF INDUSTRIAL SPACE LOCATED AT THE SOUTHWEST CORNER OF 2445 S. ALAMEDA ST., LOS ANGELES, CA 90058</u>. Hereinafter known as the "Premises".

2.     **USE OF LEASED PREMISES**: The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only.

3.     **TERM OF LEASE**: The term of this Lease shall be for a period of <u>ONE (1) year commencing on the FIRST day of APRIL, 2019 and expiring at Midnight on the 31ST day of MARCH, 2020.</u> ("Initial Term"). If Property were to be sold before the 1 year agreement, a 3 month notice to move out will be delivered to the Lessee.

4.     **BASE RENT**: The net monthly payment shall be <u>TWO THOUSAND FIVE HUNDRED dollars ($2,500),</u> payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the FIRST day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.     **OPTION TO RENEW**: NONE

6.     **EXPENSES**: It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease". In addition to the Base Rent, the Lessee is responsible for the following monthly expenses: LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.     **SECURITY DEPOSIT**: <u>$5,000 FIRST AND LAST MONTH RENT</u>

8.     **LEASEHOLD IMPROVEMENTS**: The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.

Tenant's Initials _____ Landlord's Initials _____ 

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.      **LICENSES AND PERMITS:** A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.     **OBLIGATIONS OF LESSEE:** The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made In a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.     **INSURANCE:** In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees

Tenant's Initials_____Landlord's Initials_____

not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

12.    **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.    **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.    **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

Tenant's Initials _____ Landlord's Initials _____

15.    **INDEMNIFICATION:** The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.    **BANKRUPTCY - INSOLVENCY:** The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.    **SUBORDINATION AND ATTORNMENT:** Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.    **MISCELLANEOUS TERMS:**

I.   Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

ii.  Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first

Tenant's Initials _____ Landlord's Initials _____

approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

III. Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV. Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V. Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.    **ESTOPPEL CERTIFICATE**: Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.    **HOLDOVER**: Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.    **WAIVER**: Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.    **GOVERNING LAW**: This Lease shall be governed by the laws of the State of California.

23.    **NOTICES**: Payments and notices shall be addressed to the following:

Lessor    2203 S. ALAMEDA ST.
LOS ANGELES, CA 90058

Lessee    _____
_____

Tenant's Initials _____ Landlord's Initials _____

24.    **AMENDMENT**: No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

25.    **BINDING EFFECT**: This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

IN WITNESS WHEREOF, the parties hereto set their hands and seal this _____ day of MARCH, 2019.

**LESSEE**

_____
**Signature**

KIM KI JOONG
**Printed Name**

**CENTRAL METAL INC**

_____
**Signature**

Jong UK Byun.
**Printed Name**

Tenant's Initials _____ Landlord's Initials _____

# Exhibit "B"

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., of 2203 S. Alameda St., Los Angeles, CA 90058 hereinafter referred to as "Lessor", and __ALLISON & DIESEL TRANSMISSION PARTS__, of _____

_____, hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.     **DESCRIPTION OF LEASED PREMISES:** The Lessor agrees to lease to the Lessee the following described: <u>25,500 net SQUARE FEET (SF) OF INDUSTRIAL SPACE LOCATED AT THE SOUTHWEST CORNER OF 2445 S. ALAMEDA ST., LOS ANGELES, CA 90058</u>. Hereinafter known as the "Premises".

2.     **USE OF LEASED PREMISES:** The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only.

3.     **TERM OF LEASE:** The term of this Lease shall be for a period of <u>Five (5) year commencing on APRIL 10, 2020 and expiring on April 10, 2025</u>. ("Initial Term"). If Property were to be sold before the 1 year agreement, a 3 month notice to move out will be delivered to the Lessee.

4.     **BASE RENT:** The net monthly payment shall be <u>TWELVE THOUSAND DOLLARS ($12,000)</u>, payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the 10th day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.     **OPTION TO RENEW:** OPEN

6.     **EXPENSES:** It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease". In addition to the Base Rent, the Lessee is responsible for the following monthly expenses: LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.     **SECURITY DEPOSIT:** <u>$12,000 FIRST AND LAST MONTH RENT</u>

8.     **LEASEHOLD IMPROVEMENTS:** The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any


Tenant's Initials _FACE_ Landlord's Initials

person under and through whom the Lessee has acquired its interest in the Premises with a mechanics lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.    **LICENSES AND PERMITS**: A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.    **OBLIGATIONS OF LESSEE**: The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.    **INSURANCE**: In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage

Tenant's Initials _FABE_ Landlord's Initials

covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

12.    **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.    **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.    **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a
LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

15.    **INDEMNIFICATION**: The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever

Tenant's Initials_____ Landlord's Initials_____

as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.    **BANKRUPTCY - INSOLVENCY**: The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.    **SUBORDINATION AND ATTORNMENT**: Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.    **MISCELLANEOUS TERMS:**

I.    Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

II.    Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building.

Tenant's Initials _FAGE_ Landlord's Initials _____

Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

III.   Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV.   Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V.   Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.   **ESTOPPEL CERTIFICATE:** Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.   **HOLDOVER:** Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.   **WAIVER:** Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.   **GOVERNING LAW:** This Lease shall be governed by the laws of the State of California.

23.   **NOTICES:** Payments and notices shall be addressed to the following:

Lessor        2203 S. ALAMEDA ST
              LOS ANGELES CA 90058

Lessee        _____
              _____

24.   **AMENDMENT:** No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.



Tenant's Initials _EAGE_ Landlord's Initials

25.    **BINDING EFFECT:** This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

IN WITNESS WHEREOF, the parties hereto set their hands and seal this 10 day of APRIL, 2020.

LESSEE
**ALLISON & DIESEL
TRANSMISSIONS & PARTS**

LESSOR
**CENTRAL METAL INC**

Signature

Fernando A Gonzalez
**Printed Name**

Signature

**Printed Name**

Tenant's Initials _____ Landlord's Initials

# Amendment

As of October 10 2020, the Lease Agreement between Central Metal Inc. and Allison & Diesel Transmission Parts will make the following change:

Lease will be increased by $690. New Monthly Lease will be $12,690, starting October 10 2020 will be added to the original contract.

These changes are the only changes to the original contract. The entire remainder of the original contract remains in full force. This Amendment shall be effective once signed by both parties.

This Amendment should be sign by the following:

By: _Fernando A. Gonzalez_                Date:_____10/1/2020_____

    Allison & Diesel Transmission Parts
    Fernando A. Gonzalez

By: _____        Date: _10-1-2020_

    Central Metal Inc.

# Exhibit "C"

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A



CALIFORNIA
ASSOCIATION
OF REALTORS®

**COMMERCIAL LEASE AGREEMENT**
(C.A.R. Form CL, Revised 12/15)

Date (For reference only): **August 24, 2020**

**Central Metals Inc.**
**Fleet yards Inc.**

1. **PROPERTY:** Landlord rents to Tenant and Tenant rents from Landlord, the real property and improvements described as: **8201 Santa Fe ave,** ("Landlord") and
   **Huntington Park Ca 90255** ("Tenant") agree as follows:
   comprise approximately _____ % of the total square footage of rentable space in the entire property. See exhibit _____ ("Premises"), which
   description of the Premises.

2. **TERM:** The term begins on (date) _____ for a further
   (Check A or B):
   ☒ A. Lease; and shall terminate on (date) **August 1, 2020** ("Commencement Date"),
   the term of this agreement expires, with Landlord's consent, shall create a month-to-month tenancy that either party may terminate as
   specified in paragraph 2B. Rent shall be at a rate equal to the rent for the immediately preceding month, payable in advance. All other
   terms and conditions of this agreement shall remain in full force and effect. **August 14, 2025** at **12** ☒AM ☐PM. Any holding over after
   ☐ B. **Month-to-month:** and continues as a month-to-month tenancy. Either party may terminate the tenancy by giving written notice to the
   other at least 30 days prior to the intended termination date, subject to any applicable laws. Such notice may be given on any date.
   ☐ C. **RENEWAL OR EXTENSION TERMS:** See attached addendum.

3. **BASE RENT:**
   A. Tenant agrees to pay Base Rent at the rate of (CHECK ONE ONLY):
      ☒ (1) **$94,286.61**
      ☐ (2) $_____ per month, for the term of the agreement.
      _____ per month, for the first 12 months of the agreement. Commencing with the 13th month, and upon expiration
      of each 12 months thereafter, rent shall be adjusted according to any increase in the U.S. Consumer Price Index of the Bureau of Labor
      Statistics of the Department of Labor for All Urban Consumers ("CPI") for _____
      (the city nearest the location of the Premises), based on the following formula: Base Rent will be multiplied by the most current CPI
      preceding the first calendar month during which the adjustment is to take effect, and divided by the most recent CPI preceding the
      Commencement Date. In no event shall any adjusted Base Rent be less than the Base Rent for the month immediately preceding the
      adjustment. If the CPI is no longer published, then the adjustment to Base Rent shall be based on an alternate index that most closely
      reflects the CPI.
      ☐ (3) $_____
      $_____ per month for the period commencing _____ and ending _____ and
      $_____ per month for the period commencing _____ and ending _____ and
      ☐ (4) In accordance with the attached rent schedule. per month for the period commencing _____ and ending _____ and
      ☐ (5) Other: **Tenant pays 2 month in advance of 5 year lease agreement to landlord for 285,717 PSF @$0.33 PSF. Due the 15th of each month.**
   B. Base Rent is payable in advance on the 1st (or ☐_____ ) day of each calendar month, and is delinquent on the next day.
   C. If the Commencement Date falls on any day other than the first day of the month, Base Rent for the first calendar month shall be prorated based
      on a 30-day period. If Tenant has paid one full month's Base Rent in advance of Commencement Date, Base Rent for the second calendar month
      shall be prorated based on a 30-day period.

   **RENT:**
   Definition: ("Rent") shall mean all monetary obligations of Tenant to Landlord under the terms of this agreement, except security deposit.
   Payment: Rent shall be paid to (Name) **Central Metals Inc.**
   _____ at (address)
   _____ ion specified by Landlord in writing to Tenant. _____, or at any other
   _____ ng: Base Rent shall be paid as specified in paragraph 3. All other Rent shall be paid within 30 days after Tenant is billed by Landlord.

   _____SSESSION: Tenant is entitled to possession of the Premises on _____
   _____ in possession prior to the Commencement Date, during this time (i) Tenant is not obligated to pay Base Rent, and (ii) Tenant ☐is
   _____ ated to pay Rent other than Base Rent. Whether or not Tenant is obligated to pay Rent prior to Commencement Date, Tenant is
   _____ mply with all other terms of this agreement.

   _____OSIT:
   _____ s to pay Landlord $_____ as a security deposit. Tenant agrees not to hold Broker responsible for its
   _____CKED): ☐ If Base Rent increases during the term of this agreement, Tenant agrees to increase security deposit by the same
   _____ increase in Base Rent.
   _____ of the security deposit may be used, as reasonably necessary, to: (i) cure Tenant's default in payment of Rent, late charges,
   _____ ("NSF") fees, or other sums due; (ii) repair damage, excluding ordinary wear and tear, caused by Tenant or by a guest or
   _____ ii) broom clean the Premises, if necessary, upon termination of tenancy; and (iv) cover any other unfulfilled obligation of
   _____ POSIT SHALL NOT BE USED BY TENANT IN LIEU OF PAYMENT OF LAST MONTH'S RENT. If all or any portion of
   _____ ed during tenancy, Tenant agrees to reinstate the total security deposit within 5 days after written notice is delivered to
   _____ er Landlord receives possession of the Premises, Landlord shall: (i) furnish Tenant an itemized statement indicating the
   _____ osit received and the basis for its disposition, and (ii) return any remaining portion of security deposit to Tenant.
   _____ nly claim upon the security deposit is for unpaid Rent, then the remaining portion of the security deposit, after
   _____ 'l be returned within 14 days after the Landlord receives possession.
   _____ ity deposit, unless required by local ordinance.

   )

   Tenant's Initials ( **DOFY** )

y zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.ziplogix.com   Phone: (562)863-2121   Fax: (562)863-3275   8201 Santa Fe

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

Premises: *8201 Santa Fe ave. Huntington Park Ca 90255*　　　　　　Date *August 24, 2020*

**7. PAYMENTS:**

| | | TOTAL DUE | PAYMENT RECEIVED | BALANCE DUE | DUE DATE |
|---|---|---|---|---|---|
| A. | Rent: From *09/15/2020* To *11/14/2020* <br> Date　　　　Date | $ *188,573.22* | $ | $ *188,573.22* | *08/07/2020* |
| B. | Security Deposit . . . . . . . . . . . . . . . . . . . . . . . | $ | $ | $ | |
| C. | Other: *August 7 to Sept 7 prior lease 8.22 acres* <br> Category | $ | $ *81,393.60* | $ *(81,393.60)* | *08/07/2020* |
| O. | Other: *Prorated 9/8-9/14 per day $3142.88* <br> Category | $ *22,000.16* | $ | $ *22,000.16* | |
| E. | Total: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ *210,573.38* | $ *81,393.60* | $ *129,179.78* | |

**8. PARKING:** Tenant is entitled to _____ unreserved and _____ reserved vehicle parking spaces. The right to parking ☒ is ☐ is not included in the Base Rent charged pursuant to paragraph 3. If not included in the Base Rent, the parking rental fee shall be an additional $ _____ per month. Parking space(s) are to be used for parking operable motor vehicles, except for trailers, boats, campers, buses or trucks (other than pick-up trucks). Tenant shall park in assigned space(s) only. Parking space(s) are to be kept clean. Vehicles leaking oil, gas or other motor vehicle fluids shall not be parked in parking spaces or on the Premises. Mechanical work or storage of inoperable vehicles is not allowed in parking space(s) or elsewhere on the Premises. No overnight parking is permitted.

**9. ADDITIONAL STORAGE:** Storage is permitted as follows: _____ The right to additional storage space ☐ is ☐ is not included in the Base Rent charged pursuant to paragraph 3. If not included in Base Rent, storage space shall be an additional $ _____ per month. Tenant shall store only personal property that Tenant owns, and shall not store property that is claimed by another, or in which another has any right, title, or interest. Tenant shall not store any improperly packaged food or perishable goods, flammable materials, explosives, or other dangerous or hazardous material. Tenant shall pay for, and be responsible for, the clean-up of any contamination caused by Tenant's use of the storage area.

**10. LATE CHARGE; INTEREST; NSF CHECKS:** Tenant acknowledges that either late payment of Rent or issuance of a NSF check may cause Landlord to incur costs and expenses, the exact amount of which are extremely difficult and impractical to determine. These costs may include, but are not limited to, processing, enforcement and accounting expenses, and late charges imposed on Landlord. If any installment of Rent due from Tenant is not received by Landlord within 5 calendar days after date due, or if a check is returned NSF, Tenant shall pay to Landlord, respectively, $ _____ as late charge, plus 10% interest per annum on the delinquent amount and $25.00 as a NSF fee, any of which shall be deemed additional Rent. Landlord and Tenant agree that these charges represent a fair and reasonable estimate of the costs Landlord may incur by reason of Tenant's late or NSF payment. Any late charge, delinquent interest, or NSF fee due shall be paid with the current installment of Rent. Landlord's acceptance of any late charge or NSF fee shall not constitute a waiver as to any default of Tenant. Landlord's right to collect a Late Charge or NSF fee shall not be deemed an extension of the date Rent is due under paragraph 4, or prevent Landlord from exercising any other rights and remedies under this agreement, and as provided by law.

**11. CONDITION OF PREMISES:** Tenant has examined the Premises and acknowledges that Premise is clean and in operative condition, with the following exceptions: _____ Items listed as exceptions shall be dealt with in the following manner: _____

**12. ZONING AND LAND USE:** Tenant accepts the Premises subject to all local, state and federal laws, regulations and ordinances ("Laws"). Landlord makes no representation or warranty that Premises are now or in the future will be suitable for Tenant's use. Tenant has made its own investigation regarding all applicable Laws.

**13. TENANT OPERATING EXPENSES:** Tenant agrees to pay for all utilities and services directly billed to Tenant.

**14. PROPERTY OPERATING EXPENSES:**
A. Tenant agrees to pay its proportionate share of Landlord's estimated monthly property operating expenses, including but not limited to, common area maintenance, consolidated utility and service bills, insurance, and real property taxes, based on the ratio of the square footage of the Premises to the total square footage of the rentable space in the entire property. *This section 14 it is Not Applicable pertaining to this lease. See addendum #1.*

OR B. ☐ (if checked) Paragraph 14 does not apply.

**15. USE:** The Premises are for the sole use as *Transportation containers and Trucks* _____ No other use is permitted without Landlord's prior written consent. If any use by Tenant causes an increase in the premium on Landlord's existing property insurance, Tenant shall pay for the increased cost. Tenant will comply with all Laws affecting its use of the Premises.

**16. RULES/REGULATIONS:** Tenant agrees to comply with all rules and regulations of Landlord (and, if applicable, Owner's Association) that are at any time posted on the Premises or delivered to Tenant. Tenant shall not, and shall ensure that guests and licensees of Tenant do not, disturb, annoy, endanger, or interfere with other tenants of the building or neighbors, or use the Premises for any unlawful purposes, including, but not limited to, using, manufacturing, selling, storing, or transporting illicit drugs or other contraband, or violate any law or ordinance, or committing a waste or nuisance on or about the Premises.

**17. MAINTENANCE:**
A. Tenant OR ☐ (if checked, Landlord) shall professionally maintain the Premises including heating, air conditioning, electrical, plumbing and water systems, if any, and keep glass, windows and doors in operable and safe condition. Unless Landlord is checked, if Tenant fails to maintain the Premises, Landlord may contract for or perform such maintenance, and charge Tenant for Landlord's cost.
B. Landlord OR ☐ (if checked, Tenant) shall maintain the roof, foundation, exterior walls, common areas and

Landlord's Initials ( ____ ) ( ____ )　　　　　　　　　　　Tenant's Initials ( *DOEU* ( ____ )

CL REVISED 12/15 (PAGE 2 OF 6)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com　　　　8201 Santa Fe

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

Premises: 8201 Santa Fe ave. Huntington Park Ca 90255                                                                      Date August 24, 2020

18. **ALTERATIONS:** Tenant shall not make any alterations in or about the Premises, including installation of trade fixtures and signs, without Landlord's prior written consent, which shall not be unreasonably withheld. Any alterations to the Premises shall be done according to Law and with required permits. Tenant shall give Landlord advance notice of the commencement date of any planned alteration, so that Landlord, at its option, may post a Notice of Non-Responsibility to prevent potential liens against Landlord's interest in the Premises. Landlord may also require Tenant to provide Landlord with lien releases from any contractor performing work on the Premises.

19. **GOVERNMENT IMPOSED ALTERATIONS:** Any alterations required by Law as a result of Tenant's use shall be Tenant's responsibility. Landlord shall be responsible for any other alterations required by Law.

20. **ENTRY:** Tenant shall make Premises available to Landlord or Landlord's agent for the purpose of entering to make inspections, necessary or agreed repairs, alterations, or improvements, or to supply necessary or agreed services, or to show Premises to prospective or actual purchasers, tenants, mortgagees, lenders, appraisers, or contractors. Landlord and Tenant agree that 24 hours notice (oral or written) shall be reasonable and sufficient notice. In an emergency, Landlord or Landlord's representative may enter Premises at any time without prior notice.

21. **SIGNS:** Tenant authorizes Landlord to place a FOR SALE sign on the Premises at any time, and a FOR LEASE sign on the Premises within the 90 (or ☐ _____) day period preceding the termination of the agreement.

22. **SUBLETTING/ASSIGNMENT:** Tenant shall not sublet or encumber all or any part of Premises, or assign or transfer this agreement or any interest in it, without the prior written consent of Landlord, which shall not be unreasonably withheld. Unless such consent is obtained, any subletting, assignment, transfer, or encumbrance of the Premises, agreement, or tenancy, by voluntary act of Tenant, operation of law, or otherwise, shall be null and void, and, at the option of Landlord, terminate this agreement. Any proposed sublessee, assignee, or transferee shall submit to Landlord an application and credit information for Landlord's approval, and, if approved, sign a separate written agreement with Landlord and Tenant. Landlord's consent to any one sublease, assignment, or transfer, shall not be construed as consent to any subsequent sublease, assignment, or transfer, and does not release Tenant of Tenant's obligation under this agreement.

23. **POSSESSION:** If Landlord is unable to deliver possession of Premises on Commencement Date, such date shall be extended to the date on which possession is made available to Tenant. However, the expiration date shall remain the same as specified in paragraph 2. If Landlord is unable to deliver possession within 60 (or ☐ _____) calendar days after the agreed Commencement Date, Tenant may terminate this agreement by giving written notice to Landlord, and shall be refunded all Rent and security deposit paid.

24. **TENANT'S OBLIGATIONS UPON VACATING PREMISES:** Upon termination of agreement, Tenant shall: (i) give Landlord all copies of all keys or opening devices to Premises, including any common areas; (ii) vacate Premises and surrender it to Landlord empty of all persons and personal property; (iii) vacate all parking and storage spaces; (iv) deliver Premises to Landlord in the same condition as referenced in paragraph 11; (v) clean Premises; (vi) give written notice to Landlord of Tenant's forwarding address; and (vii) _____

_____

All improvements installed by Tenant, with or without Landlord's consent, become the property of Landlord upon termination. Landlord may nevertheless require Tenant to remove any such improvement that did not exist at the time possession was made available to Tenant.

25. **BREACH OF CONTRACT/EARLY TERMINATION:** In event Tenant, prior to expiration of this agreement, breaches any obligation in this agreement, abandons the premises, or gives notice of tenant's intent to terminate this tenancy prior to its expiration, in addition to any obligations established by paragraph 24, Tenant shall also be responsible for lost rent, rental commissions, advertising expenses, and painting costs necessary to ready Premises for re-rental. Landlord may also recover from Tenant: (i) the worth, at the time of award, of the unpaid Rent that had been earned at the time of termination; (ii) the worth, at the time of award, of the amount by which the unpaid Rent that would have been earned after expiration until the time of award exceeds the amount of such rental loss the Tenant proves could have been reasonably avoided; and (iii) the worth, at the time of award, of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided. Landlord may elect to continue the tenancy in effect for so long as Landlord does not terminate Tenant's right to possession, by either written notice of termination of possession or by reletting the Premises to another who takes possession, and Landlord may enforce all Landlord's rights and remedies under this agreement, including the right to recover the Rent as it becomes due.

26. **DAMAGE TO PREMISES:** If, by no fault of Tenant, Premises are totally or partially damaged or destroyed by fire, earthquake, accident or other casualty, Landlord shall have the right to restore the Premises by repair or rebuilding. If Landlord elects to repair or rebuild, and is able to complete such restoration within 90 days from the date of damage, subject to the terms of this paragraph, this agreement shall remain in full force and effect. If Landlord is unable to restore the Premises within this time, or if Landlord elects not to restore, then either Landlord or Tenant may terminate this agreement by giving the other written notice. Rent shall be abated as of the date of damage. The abated amount shall be the current monthly Base Rent prorated on a 30-day basis. If this agreement is not terminated, and the damage is not repaired, then Rent shall be reduced based on the extent to which the damage interferes with Tenant's reasonable use of the Premises. If total or partial destruction or damage occurs as a result of an act of Tenant or Tenant's guests, (i) only Landlord shall have the right, at Landlord's sole discretion, within 30 days after such total or partial destruction or damage to treat the lease as terminated by Tenant, and (ii) Landlord shall have the right to recover damages from Tenant.

27. **HAZARDOUS MATERIALS:** Tenant shall not use, store, generate, release or dispose of any hazardous material on the Premises or the property of which the Premises are part. However, Tenant is permitted to make use of such materials that are required to be used in the normal course of Tenant's business provided that Tenant complies with all applicable Laws related to the hazardous materials. Tenant is responsible for the cost of removal and remediation, or any clean-up of any contamination caused by Tenant.

28. **CONDEMNATION:** If all or part of the Premises is condemned for public use, either party may terminate this agreement as of the date possession is given to the condemner. All condemnation proceeds, exclusive of those allocated by the condemner to Tenant's relocation costs and trade fixtures, belong to Landlord.

29. **INSURANCE:** Tenant's personal property, fixtures, equipment, inventory and vehicles are not insured by Landlord against loss or damage due to fire, theft, vandalism, rain, water, criminal or negligent acts of others, or any other cause. Tenant is to carry Tenant's own property insurance to protect Tenant from any such loss. In addition, Tenant shall carry (i) liability insurance in an amount of not less than $ _____ and (ii) 17B. Tenant's insurance shall name Landlord and Landlord's agent as additional insured. Tenant, upon Landlord's request, shall provide Landlord with a certificate of insurance establishing Tenant's compliance. Landlord shall maintain liability insurance insuring Landlord, but not Tenant, in an amount of at least $ _____, plus property insurance in an amount sufficient to cover the replacement cost of the property unless Tenant is responsible for maintenance pursuant to paragraph 17B. Tenant is advised to carry business interruption insurance in an amount at least sufficient to cover Tenant's complete rental obligation to Landlord. Landlord is advised to obtain a policy of rental loss insurance. Both Landlord and Tenant release each other, and waive their respective rights to subrogation against each other, for loss or damage covered by insurance.

Landlord's Initials ( _____ ) ( _____ )                                                                      Tenant's Initials ( _DOEU_ ) ( _____ )

CL REVISED 12/15 (PAGE 3 OF 6)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com                    8201 Santa Fe

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

Premises: 8201 Santa Fe ave. Huntington Park Ca 90255 _____ Date August 24, 2020

30. **TENANCY STATEMENT (ESTOPPEL CERTIFICATE):** Tenant shall execute and return a tenancy statement (estoppel certificate), delivered to Tenant by Landlord or Landlord's agent, within 3 days after its receipt. The tenancy statement shall acknowledge that this agreement is unmodified and in full force, or in full force as modified, and state the modifications. Failure to comply with this requirement: (i) shall be deemed Tenant's acknowledgment that the tenancy statement is true and correct, and may be relied upon by a prospective lender or purchaser; and (ii) may be treated by Landlord as a material breach of this agreement. Tenant shall also prepare, execute, and deliver to Landlord any financial statement (which will be held in confidence) reasonably requested by a prospective lender or buyer.

31. **LANDLORD'S TRANSFER:** Tenant agrees that the transferee of Landlord's interest shall be substituted as Landlord under this agreement. Landlord will be released of any further obligation to Tenant regarding the security deposit, only if the security deposit is returned to Tenant upon such transfer, or if the security deposit is actually transferred to the transferee. For all other obligations under this agreement, Landlord is released of any further liability to Tenant, upon Landlord's transfer.

32. **SUBORDINATION:** This agreement shall be subordinate to all existing liens and, at Landlord's option, the lien of any first deed of trust or first mortgage subsequently placed upon the real property of which the Premises are a part, and to any advances made on the security of the Premises, and to all renewals, modifications, consolidations, replacements, and extensions. However, as to the lien of any deed of trust or mortgage entered into after execution of this agreement, Tenant's right to quiet possession of the Premises shall not be disturbed if Tenant is not in default and so long as Tenant pays the Rent and observes and performs all of the provisions of this agreement, unless this agreement is otherwise terminated pursuant to its terms. If any mortgagee, trustee, or ground lessor elects to have this agreement placed in a security position prior to the lien of a mortgage, deed of trust, or ground lease, and gives written notice to Tenant, this agreement shall be deemed prior to that mortgage, deed of trust, or ground lease, or the date of recording.

33. **TENANT REPRESENTATIONS; CREDIT:** Tenant warrants that all statements in Tenant's financial documents and rental application are accurate. Tenant authorizes Landlord and Broker(s) to obtain Tenant's credit report at time of application and periodically during tenancy in connection with approval, modification, or enforcement of this agreement. Landlord may cancel this agreement: (i) before occupancy begins, upon disapproval of the credit report(s); or (ii) at any time, upon discovering that information in Tenant's application is false. A negative credit report reflecting on Tenant's record may be submitted to a credit reporting agency, if Tenant fails to pay Rent or comply with any other obligation under this agreement.

34. **CONSTRUCTION-RELATED ACCESSIBILITY STANDARDS:** Landlord states that the Premises ☐ has, or ☐ has not been inspected by a Certified Access Specialist. If so, Landlord states that the Premises ☐ has, or ☐ has not been determined to meet all applicable construction-related accessibility standards pursuant to Civil Code Section 55.53.

35. **DISPUTE RESOLUTION:**

   A. **MEDIATION:** Tenant and Landlord agree to mediate any dispute or claim arising between them out of this agreement, or any resulting transaction, before resorting to arbitration or court action, subject to paragraph 35B(2) below. Paragraphs 35B(2) and (3) apply whether or not the arbitration provision is initiated. Mediation fees, if any, shall be divided equally among the parties involved. If for any dispute or claim to which this paragraph applies, any party commences an action without first attempting to resolve the matter through mediation, or refuses to mediate after a request has been made, then that party shall not be entitled to recover attorney fees, even if they would otherwise be available to that party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIATED.

   B. **ARBITRATION OF DISPUTES:** (1) Tenant and Landlord agree that any dispute or claim in Law or equity arising between them out of this agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration, including and subject to paragraphs 35B(2), and (3) below. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of real estate transactional law experience, unless the parties mutually agree to a different arbitrator, who shall render an award in accordance with substantive California Law. In all other respects, the arbitration shall be conducted in accordance with Part III, Title 9 of the California Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered in any court having jurisdiction. The parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05.
   (2) **EXCLUSIONS FROM MEDIATION AND ARBITRATION:** The following matters are excluded from Mediation and Arbitration hereunder: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage, or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; (iii) the filing or enforcement of a mechanic's lien; (iv) any matter that is within the jurisdiction of a probate, small claims, or bankruptcy court; and (v) an action for bodily injury or wrongful death, or for latent or patent defects to which Code of Civil Procedure §337.1 or §337.15 applies. The filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies, shall not constitute a violation of the mediation and arbitration provisions.
   (3) **BROKERS:** Tenant and Landlord agree to mediate and arbitrate disputes or claims involving either or both Brokers, provided either or both Brokers shall have agreed to such mediation or arbitration, prior to, or within a reasonable time after the dispute or claim is presented to the agreement. Any election by either or both Brokers to participate in mediation or arbitration shall not result in Brokers being deemed parties to the agreement.

   "NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

   "WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Landlord's Initials ( ) ( )          Landlord's Initials ( ) / Tenant's Initials ( DOEH )
                                     Tenant's Initials ( DOEH ) ( )

CL REVISED 12/15 (PAGE 4 OF 6)

COMMERCIAL LEASE AGREEMENT (CL PAGE 4 OF 6)

Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com          8201 Santa Fe

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

Premises: **8201 Santa Fe ave. Huntington Park Ca 90255**                                         Date **August 24, 2020**

36. **JOINT AND INDIVIDUAL OBLIGATIONS:** If there is more than one Tenant, each one shall be individually and completely responsible for the performance of all obligations of Tenant under this agreement, jointly with every other Tenant, and individually, whether or not in possession.

37. **NOTICE:** Notices may be served by mail, facsimile, or courier at the following address or location, or at any other location subsequently designated:
Landlord:                                                                                    Tenant:

Notice is deemed effective upon the earliest of the following: (i) personal receipt by either party or their agent; (ii) written acknowledgement of notice; or (iii) 5 days after mailing notice to such location by first class mail, postage pre-paid.

38. **WAIVER:** The waiver of any breach shall not be construed as a continuing waiver of the same breach or a waiver of any subsequent breach.

39. **INDEMNIFICATION:** Tenant shall indemnify, defend and hold Landlord harmless from all claims, disputes, litigation, judgments and attorney fees arising out of Tenant's use of the Premises.

40. **OTHER TERMS AND CONDITIONS/SUPPLEMENTS:** *1. This new lease is for 6.559 acres ( 285,717 PSF) while obtaining CUP from LA county for storage of trailers. Once obtained CUP tenant will use & lease the full property acreage 11.271 acres (490,991) sq ft.*
*2.Tenant will lease 5 years & have the option to extend 5 more year lease with 11.271 acres w/obtained CUP plus the option to purchase before or after 5 years lease w/the services leasing agents S. Madrigal Jr, D. von Puschendorf & Louis Chavez for tenant & landlord.*
*3.The tenant to lease at 5.033 per sq ft from landlord 1st 5 year lease & tenant's option to do a 5 more years extension with rent increase per sq. ft. rate is based on CPI (consumer price index)to pay rate of that time w/CUP approved. All monthly lease payments to be paid via wire on the 15th of each month & to pay 2 months advance 1st 5 yrs. The landlord & tenant's to use leasing agents S. Madrigal Jr, D. von Puschendorf & Louis Chavez.*
*4. Tenant has first right to purchase or refusal of the property.S. Madrigal Jr, D.von Puschendorf & L. Chavez will represent Tenant/Buyer & landlord/seller. Tenant can lease more land if needed. See the attached addendum #1 made 08-24-20 for point #8 & #9.*
*5. The landlord will be responsible for all brokerage costs. Also this lease meant to replace/terminate existing 2 year lease of 6.559 acres.*
*6.Landlord is responsible for any past and or on going city and/or county code corrections or violations related to the property.*
*7.Tenant will not get penalized by landlord if for some reason the city/county will not allowed tenant to use all acres leased while tenant is working on obtaining a CUP from city/county. Allowing tenant to reduce the acreage per city allowed compliance to use at that time. Also to adjust leased monthly fee accordingly to the acres. If any advance payment made to the landlord to credit back to the tenant.*

The following ATTACHED supplements/exhibits are incorporated in this agreement: ☐ Option Agreement (C.A.R. Form OA)
*Continuation of other terms and conditions/supplements:*
*For section 40 point #8 & #9 please see the attached addendum #1 made on 08-24-20.*

41. **ATTORNEY FEES:** In any action or proceeding arising out of this agreement, the prevailing party between Landlord and Tenant shall be entitled to reasonable attorney fees and costs from the non-prevailing Landlord or Tenant, except as provided in paragraph 35A.

42. **ENTIRE CONTRACT:** Time is of the essence. All prior agreements between Landlord and Tenant are incorporated in this agreement, which constitutes the entire contract. It is intended as a final expression of the parties' agreement, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. The parties further intend that this agreement constitutes the complete and exclusive statement of its terms, and that no extrinsic evidence whatsoever may be introduced in any judicial or other proceeding, if any, involving this agreement. Any provision of this agreement that is held to be invalid shall not affect the validity or enforceability of any other provision in this agreement. This agreement shall be binding upon, and inure to the benefit of, the heirs, assignees and successors to the parties.

43. **BROKERAGE:** Landlord and Tenant shall each pay to Broker(s) the fee agreed to, if any, in a separate written agreement. Neither Tenant nor Landlord has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as named in this agreement, in connection with any act relating to the Premises, including, but not limited to, inquiries, introductions, consultations, and negotiations leading to this agreement. Tenant and Landlord each agree to indemnify, defend and hold harmless the other, and the Brokers specified herein, and their agents, from and against any costs, expenses, or liability for compensation claimed inconsistent with the warranty and representation in this paragraph 43.

44. **AGENCY CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
Listing Agent:        **Century 21 Allstars**        (Print Firm Name) is the agent of (check one):
☐ the Landlord exclusively; or ☒ both the Tenant and Landlord.
Selling Agent:        **Century 21 Allstars**        (Print Firm Name) (if not same as Listing Agent) is the agent of (check one):
☐ the Tenant exclusively; or ☐ the Landlord exclusively; or ☐ both the Tenant and Landlord.
Real Estate Brokers are not parties to the agreement between Tenant and Landlord.

Landlord's Initials (        ) (        )                                         Tenant's Initials (  ) (        )

**CL REVISED 12/15 (PAGE 5 OF 6)**

COMMERCIAL LEASE AGREEMENT (CL PAGE 5 OF 6)
Produced with zipForm® by zipLogix  18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com        8201 Santa Fe



DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

Premises: 8201 Santa Fe ave. Huntington Park Ca 90255

Date August 24, 2020

Landlord and Tenant acknowledge and agree that Brokers: (i) do not guarantee the condition of the Premises; (ii) cannot verify representations made by others; (iii) will not verify zoning and land use restrictions; (iv) cannot provide legal or tax advice; (v) will not provide other advice or information that exceeds the knowledge, education or experience required to obtain a real estate license. Furthermore, if Brokers are not also acting as Landlord in this agreement, Brokers: (vi) do not decide what rental rate a Tenant should pay or Landlord should accept; and (vii) do not decide upon the length or other terms of tenancy. Landlord and Tenant agree that they will seek legal, tax, insurance, and other desired assistance from appropriate professionals.

Tenant _Dan Olting - Fleet Yards_    Date 8/25/2020

Fleet Yards Inc.

(Print name)

Address _____ City _____ State _____ Zip _____

Tenant _____    Date _____

(Print name)

Address _____ City _____ State _____ Zip _____

☐ GUARANTEE: In consideration of the execution of this Agreement by and between Landlord and Tenant and for valuable consideration, receipt of which is hereby acknowledged, the undersigned ("Guarantor") does hereby: (i) guarantee unconditionally to Landlord and Landlord's agents, successors and assigns, the prompt payment of Rent or other sums that become due pursuant to this Agreement, including any and all court costs and attorney fees included in enforcing the Agreement; (ii) consent to any changes, modifications or alterations of any term in this Agreement agreed to by Landlord and Tenant; and (iii) waive any right to require Landlord and/or Landlord's agents to proceed against Tenant for any default occurring under this Agreement before seeking to enforce this Guarantee.

Guarantor (Print Name) _____

Guarantor _____

Address _____ City _____ Date _____

Telephone _____ Fax _____ E-mail _____ State _____ Zip _____

Landlord agrees to rent the Premises on the above terms and conditions.

Landlord _____ Date 8-24-2020

(owner or agent with authority to enter into this agreement) Central Metals Inc.

Address _____ City _____ State _____ Zip _____

Landlord _____ Date _____

(owner or agent with authority to enter into this agreement)

Address _____ City _____ State _____ Zip _____

Agency relationships are confirmed as above. Real estate brokers who are not also Landlord in this agreement are not a party to the agreement between Landlord and Tenant.

Real Estate Broker (Leasing Firm) Century 21 Allstars    DRE Lic. # 01280955

By (Agent) _____    DRE Lic. # 01971402/01363650/0194 Date 8/24/20

Dieter Von Puschendorf, Silvestre Madrigal Jr & Louis Chavez

Address 9155 Telegraph Rd    City Pico Rivera    State CA    Zip 90660

Telephone (714) 349-6649    Fax (562) 863-3275    E-mail dvpworld@gmail.com

Real Estate Broker (Listing Firm) Century 21 Allstars    DRE Lic. # 01280955

By (Agent) _____    DRE Lic. # 01971402/01363650/0194 Date 8/24/20

D. Von Puschendorf, L.Chavez, S. Madrigal

Address _____ City _____ State _____ Zip _____

Telephone _____ Fax _____ E-mail _____

© 2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

CL REVISED 12/15 (PAGE 6 OF 6)

COMMERCIAL LEASE AGREEMENT (CL PAGE 6 OF 6)

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com    8201 Santa Fe

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A



CALIFORNIA
ASSOCIATION
OF REALTORS®

**ADDENDUM**
(C.A.R. Form ADM, Revised 12/15)

No. *1*

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Purchase Agreement, ☐ Residential Lease
or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right
to rescind), ☒ Other *Commercial Industrial land lease continuation of other terms and conditions/supplements.*
dated _____, on property known as *8201 Santa Fe Ave*
*Huntington Park, CA 90255*
in which *Fleet Yards Inc.* is referred to as ("Buyer/Tenant")
and *Central Metals Inc.* is referred to as ("Seller/Landlord").

*Continuation of other terms and conditions/supplements from section 40 of Commercial Lease agreement page 5 of 6:*

*8-In the event that, through no fault of Tenant, and despite Tenant's diligent, continuous good-faith efforts, Tenant is unable
to procure a Conditional Use Permit ("CUP") for the Premises, or Tenant is prohibited from engaging in trucking-related
activities in the Premises by the City of Huntington Park, the County of Los Angeles, or any other governmental agency, any
law or ordinance is enacted or changed, with the result that Tenant cannot conduct its business in the Premises for the
Agreed Use, or any other use that Tenant, in its good faith judgment, determines to engage in at the Premises, or if the
requirements of the CUP are not economically feasible, Tenant shall have the right to terminate this Lease by giving Landlord
thirty (30) days' written notice of such termination. Notwithstanding the foregoing, Landlord shall may, at its option, elect to
assist Tenant with obtaining issuance of the required permits within such thirty (30) day period, and if Landlord is able to do
so, the termination shall be deemed null and void. Landlord shall be responsible for all CUP fees.*

*9-Tenant will be performing all maintenance and will not be paying CAMs Common Area Maintenance; Landlord to pay
property taxes and insurance.*

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date    8/25/2020                                              Date    8-26-2020

Buyer/Tenant  _Dan Otting  Fleet Yards_      Seller/Landlord  _____
*Fleet Yards Inc.*                                           *Central Metals Inc.*

Buyer/Tenant  _____              Seller/Landlord  _____

© 1986-2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of
this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY
OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE
TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify
the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS®
who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

ADM REVISED 12/15 (PAGE 1 OF 1)

**ADDENDUM (ADM PAGE 1 OF 1)**

Century 21 Allstars, 9155 Telegraph Rd Pico Rivera CA 90660        Phone: (562)863-2121        Fax:(562)863-3275        8201 Santa Fe
Dieter Von Puschendorf        Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5  www.lwolf.com

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A



CALIFORNIA
ASSOCIATION
OF REALTORS®

**COMMERCIAL LEASE CONSTRUCTION
ACCESSIBILITY ADDENDUM**
(C.A.R. Form CLCA 11/16)

This is an addendum to the Commercial Lease Agreement (lease) dated _____ **August 24, 2020**
In which                          **Central Metals Inc.**                          is referred to as "Landlord"
and                              **Fleet Yards Inc.**                              is referred to as "Tenant".
Paragraph 34 of the lease is deleted in its entirety and replaced by the following:

**Paragraph 34. CONSTRUCTION-RELATED ACCESSIBILITY STANDARDS:**
A.  Landlord states that the Premises ☐ have, or ☒ have not been inspected by a Certified Access Specialist (CASp).
B.  If the Premises have been inspected by a CASp,
    (1) Landlord states that the Premises ☐ have, or ☐ have not been determined to meet all applicable construction-related
        accessibility standards pursuant to Civil Code Section 55.53. Landlord shall provide Tenant a copy of the report
        prepared by the CASp (and, if applicable a copy of the disability access inspection certificate) as specified below.
    (2) ☐ (i) Tenant has received a copy of the report at least 48 hours before executing this lease. Tenant has no right
        to rescind the lease based upon information contained in the report.
OR  ☐ (ii) Tenant has received a copy of the report prior to, but no more than, 48 hours before, executing this lease.
        Based upon information contained in the report, Tenant has 72 hours after execution of this lease to rescind it.
OR  ☐ (iii) Tenant has not received a copy of the report prepared by the CASp prior to execution of this lease.
        Landlord shall provide a copy of the report prepared by the CASp (and, if applicable a copy of the disability access
        inspection certificate) within 7 days after execution of this lease. Tenant shall have up to 3 days thereafter to
        rescind the lease based upon information in the report.
C.  If the Premises have not been inspected by a CASp or a certificate was not issued by the CASp who conducted the
    inspection,
        "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject
        premises comply with all of the applicable construction-related accessibility standards under state law. Although
        state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor
        may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy
        or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually
        agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp
        inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility
        standards within the premises."
D.  Notwithstanding anything to the contrary in paragraph 17, 18, 19 or elsewhere in the lease, any repairs or
    modifications necessary to correct violations of construction related accessibility standards are the responsibility of
    Tenant, ☒ Landlord, ☐ Other _____.

Tenant (Signature) _Dan Olling - Fleet Yards_ _____ Date  8/25/2020

Tenant (Print name) **Fleet Yards Inc.** _____

Tenant (Signature) _____ Date _____

Tenant (Print name) _____

Landlord (Signature) _____ Date _____

Landlord (Print name) **Central Metals Inc.** _____

Landlord (Signature) _____ Date _____

Landlord (Print name) _____

© 2016, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this
form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY
OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE
TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

CLCA 11/16 (PAGE 1 OF 1)
**COMMERCIAL LEASE CONSTRUCTION ACCESSIBILITY ADDENDUM (CLCA PAGE 1 OF 1)**

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A



CALIFORNIA
ASSOCIATION
OF REALTORS®

# DISCLOSURE REGARDING
# REAL ESTATE AGENCY RELATIONSHIP
(Seller's Brokerage Firm to Seller)
(As required by the Civil Code)
(C.A.R. Form AD, Revised 12/18)

☐ (If checked) This form is being provided in connection with a transaction for a leasehold interest exceeding one year as per Civil Code section 2079.13(j), (k) and (l).

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A Fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
  (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b) A duty of honest and fair dealing and good faith.
  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
  (a) Diligent exercise of reasonable skill and care in performance of the agent's duties.
  (b) A duty of honest and fair dealing and good faith.
  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties. An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salespersons and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
  (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
  (b) Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role.

The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation.

Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).

| | |
|---|---|
| ☐ Buyer ☐ Seller ☒ Landlord ☐ Tenant _____ | Date _8-24-2020_ |
| ☐ Buyer ☐ Seller ☐ Landlord ☒ Tenant _Dan Altura, Elliet Yards_ | Date _8/25/2020_ |
| _FLEET ___  ___ | |

Agent _Century 21 Allstars_      DRE Lic. # _01280965_
       Real Estate Broker (Firm)

By _____  DRE Lic. # _01971402/01363650/01949822_     Date _8/24/20_
   (Salesperson or Broker-Associate, if any)   **D. Von Puschendorf, L.Chavez, S. Madrigal**

© 1991-2018, California Association of REALTORS®, Inc.
AD REVISED 12/18 (PAGE 1 OF 2)

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 1 OF 2)**

Century 21 Allstars, 9155 Telegraph Rd Pico Rivera CA 90660   Phone: (562)863-2121   Fax: (562)863-3275    5101 Santa Fe
Dieter Von Puschendorf    Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

DocuSign Envelope ID: 8D945FFB-1494-4AEF-9FED-F1DD04E5A88A

**CIVIL CODE SECTIONS 2079.13 – 2079.24 (2079.16 APPEARS ON THE FRONT)**

2079.13. As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings: (a) "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. (b) "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. (c) "Commercial real property" means all real property in the state, except: (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobilehome, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29, (d) "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. (e) "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to be given pursuant to the terms of the agreement. (f) "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. (g) "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. (h) "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. (i) "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. (j) "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multiunit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobilehome as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. (k) "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. (l) "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. (m) "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. (n) "Buyer's agent" means an agent who represents a buyer in a real property transaction.

2079.14. A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgment of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: (a) The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. (b) The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase, if the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

2079.15. In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

2079.16. Reproduced on Page 1 of this AD form.

2079.17(a) As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. (b) As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.

**CONFIRMATION:** The following agency relationships are confirmed for this transaction:

Seller's Brokerage Firm    DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the seller, or ☐ both the buyer and seller. (dual agent)
Seller's Agent    DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)
Buyer's Brokerage Firm    DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is the broker of (check one): ☐ the buyer, or ☐ both the buyer and seller. (dual agent)
Buyer's Agent    DO NOT COMPLETE. SAMPLE ONLY _____ License Number _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate) ☐ both the Buyer's and Seller's Agent. (dual agent)

(d) The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

2079.18 (Repealed pursuant to AB-1289).

2079.19 The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

2079.20 Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

2079.21 (a) A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. (b) A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. (c) "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. (d) This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than price.

2079.22 Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

2079.23 A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship.

2079.24 Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

© 1991-2018, California Association of REALTORS®, Inc.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020



AD REVISED 12/18 (PAGE 2 OF 2)

**DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP (AD PAGE 2 OF 2)**

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com    8201 Santa Fe



**CALIFORNIA ASSOCIATION OF REALTORS®**

**ADDENDUM**

(C.A.R. Form ADM, Revised 12/15)

**No. 3**

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Purchase Agreement, ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☒ Other *Commercial Industrial land lease 5 years addition & revision agreement.*

dated _____, on property known as _____ *8201 Santa Fe Ave* _____

_____ *Huntington Park, CA 90255* _____

in which _____ *Fleet Yards Inc.* _____ is referred to as ("Buyer/Tenant")

and _____ *Central Metals Inc.* _____ is referred to as ("Seller/Landlord").

*1- Tenant to use the new wire account of the landlord from now on for all lease/rental payments on noted here:*
*Bank name: Hanmi Bank. Bank routing: 122039399 Bank Address: 950 S. Los Angeles St. LA, Ca 90015 Account holder name:*
*Central Metal Inc. Account number: 500504684 Acct holder address: 8201 Santa Fe Huntington park Ca 90255.*

*2-Tenant will be adding more acreage/square feet to be added to the 5 year lease agreement for the following ending APN 010*
*& 011 at the tail end residential area that will be utilized to put more trailers. A deduction of the access road of 12,512 sq. ft.*
*will be made from the 1.81 acres/78,843.60 sq. ft. that leaves available to lease/use of 1.522 acres (66,331 sq. ft.)*

*3-The new additional land lease of 1.522 acres (66,331 sq. ft.) @$0.33 PSF and it will be added to the current 5 years lease of*
*285,717 sq. ft. (6.559 acres) for $94,286.61 per month. Then the new added land lease space brings the 5 years lease space*
*usage to be 352,048 sq. ft. (8.082 acres) @ $0.33 per sq. ft. Therefore the new monthly lease wire payment is to start*
*November 15th, 2020 and to continue to be on the 15th of each month for the amount of $116,175.84 for the next 5 years until*
*Sept 14th of 2025. If nothing changes with the CUP approval and or landlord on going bankruptcy matter.*

*4-If for whatever reason City/County of LA decides not to allow the use of this section APN 010-11 and any other use of the*
*property as land trailers storage space then tenant will not be penalized for it. At that time it will be remove or adjusted any*
*space from the lease is not allowed to be use by the tenant per the LA county for whatever reason while obtaining a CUP &*
*the tenant gets reimburse or credit for the not allowed land space by the landlord.*

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date _____     Date _____

Buyer/Tenant _____     Seller/Landlord _____
     *Fleet Yards Inc.*     *Central Metals Inc.*

Buyer/Tenant _____     Seller/Landlord _____

© 1986-2015. California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**ADM REVISED 12/15 (PAGE 1 OF 1)**

**ADDENDUM (ADM PAGE 1 OF 1)**

# Exhibit "D"

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., hereinafter referred to as "Lessor", and __UNION CM INC__ hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.    **DESCRIPTION OF LEASED PREMISES**: The Lessor agrees to lease to the Lessee the following described: 82,000 sqf at .50/sqf INDUSTRIAL SPACE LOCATED AT 2203 S ALAMEDA ST LOS ANGELES, CA 90058. Hereinafter known as the "Premises".

2.    **USE OF LEASED PREMISES**: The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only.

3.    **TERM OF LEASE**: The term of this Lease shall be for a period of Five (5) year commencing on November 1st 2019 and expiring on November 1st 2024. ("Initial Term"). If Property were to be sold before the 5-year agreement, a 3-month notice to move out will be delivered to the Lessee.

4.    **BASE RENT**: The net monthly payment shall be FORTY ONE THOUSAND DOLLARS ($41,000), payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the 1ST day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.    **OPTION TO RENEW**: OPEN

6.    **EXPENSES**: It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease". In addition to the Base Rent, the Lessee is responsible for the following monthly expenses: LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.    **SECURITY DEPOSIT**: $41,000 FIRST AND LAST MONTH RENT

8.    **LEASEHOLD IMPROVEMENTS**: The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against

Tenant's Initials KMM Landlord's Initials 

the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.    **LICENSES AND PERMITS**: A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.    **OBLIGATIONS OF LESSEE**: The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.    **INSURANCE**: In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

Tenant's Initials KMH Landlord's Initials

12.    **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.    **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.    **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a
LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

15.    **INDEMNIFICATION**: The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and

Tenant's Initials K̲M̲H̲ Landlord's Initials 

hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.    **BANKRUPTCY - INSOLVENCY**: The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.    **SUBORDINATION AND ATTORNMENT**: Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.    **MISCELLANEOUS TERMS:**

I.    Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

II.    Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

Tenant's Initials _KMH_  Landlord's Initials

III. Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV. Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V. Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.    **ESTOPPEL CERTIFICATE:** Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.    **HOLDOVER:** Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.    **WAIVER:** Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.    **GOVERNING LAW:** This Lease shall be governed by the laws of the State of California.

23.    **NOTICES:** Payments and notices shall be addressed to the following:

Lessor

Lessee    _____

    _____

24.    **AMENDMENT:** No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

25.    **BINDING EFFECT:** This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

Tenant's Initials K|M†| Landlord's Initials 

IN WITNESS WHEREOF, the parties hereto set their hands and seal this 1ST day of November, 2019.

LESSEE
UNION CM INC

LESSOR
CENTRAL METAL INC.

Signature

Signature

Mihyun Kim
Printed Name

Jong uk Byun
Printed Name

Tenant's Initials KMH  Landlord's Initials

# Exhibit "E"

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., hereinafter referred to as "Lessor", and __UNION CM INC__ hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.     **DESCRIPTION OF LEASED PREMISES**: The Lessor agrees to lease to the Lessee the following described: 52,000 sqf at .40/sqf INDUSTRIAL SPACE LOCATED AT 1736 E 24TH ST LOS ANGELES, CA 90058. Hereinafter known as the "Premises".

2.     **USE OF LEASED PREMISES**: The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only.

3.     **TERM OF LEASE**: The term of this Lease shall be for a period of Five (5) year commencing on November 1st 2019 and expiring on November 1st 2024. ("Initial Term"). If Property were to be sold before the 5-year agreement, a 3-month notice to move out will be delivered to the Lessee.

4.     **BASE RENT**: The net monthly payment shall be TWENTY THOUSAND EIGHT HUNDRED DOLLARS ($20,800), payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the 1ST day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.     **OPTION TO RENEW**: OPEN

6.     **EXPENSES**: It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease". In addition to the Base Rent, the Lessee is responsible for the following monthly expenses: LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.     **SECURITY DEPOSIT**: $20,800 FIRST AND LAST MONTH RENT

8.     **LEASEHOLD IMPROVEMENTS**: The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against

Tenant's Initials K Mr| Landlord's Initials 

the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.      **LICENSES AND PERMITS**: A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.     **OBLIGATIONS OF LESSEE**: The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.     **INSURANCE**: In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

Tenant's Initials KMH Landlord's Initials

12.   **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.   **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.   **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a
LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

15.   **INDEMNIFICATION**: The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and

Tenant's Initials KMH Landlord's Initials

hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.    **BANKRUPTCY - INSOLVENCY**: The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.    **SUBORDINATION AND ATTORNMENT**: Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.    **MISCELLANEOUS TERMS**:

I.    Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

II.    Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first approved by Lessor in good condition and repair.  Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

Tenant's Initials K̲M̲H̲ Landlord's Initials 

III. Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV. Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V. Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.    **ESTOPPEL CERTIFICATE**: Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.    **HOLDOVER**: Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.    **WAIVER**: Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.    **GOVERNING LAW**: This Lease shall be governed by the laws of the State of California.

23.    **NOTICES**: Payments and notices shall be addressed to the following:

Lessor

Lessee    _____

_____

24.    **AMENDMENT**: No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

25.    **BINDING EFFECT**: This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

Tenant's Initials KMH Landlord's Initials 

IN WITNESS WHEREOF, the parties hereto set their hands and seal this 1ST day of November, 2019.

**LESSEE**
**UNION CM INC**

**LESSOR**
**CENTRAL METAL INC.**

_____
Signature

_____
Signature

_Mihyun Kim_
Printed Name

_Jong uic Byrn_
Printed Name

Tenant's Initials _KMH_ Landlord's Initials

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., of 2203 S. Alameda St., Los Angeles, CA 90058 hereinafter referred to as "Lessor", and _____KIM KI JOONG_____
_____, of _____
_____, hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.    **DESCRIPTION OF LEASED PREMISES**: The Lessor agrees to lease to the Lessee the following described: 2418.25 net SQUARE FEET (SF) OF INDUSTRIAL SPACE LOCATED AT THE SOUTHWEST CORNER OF 2445 S. ALAMEDA ST., LOS ANGELES, CA 90058. Hereinafter known as the "Premises".

2.    **USE OF LEASED PREMISES**: The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only.

3.    **TERM OF LEASE**: The term of this Lease shall be for a period of ONE (1) year commencing on the FIRST day of APRIL, 2019 and expiring at Midnight on the 31ST day of MARCH, 2020. ("Initial Term"). If Property were to be sold before the 1 year agreement, a 3 month notice to move out will be delivered to the Lessee.

4.    **BASE RENT**: The net monthly payment shall be TWO THOUSAND FIVE HUNDRED dollars ($2,500), payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the FIRST day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.    **OPTION TO RENEW**: NONE

6.    **EXPENSES**: It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease". In addition to the Base Rent, the Lessee is responsible for the following monthly expenses LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.    **SECURITY DEPOSIT**: $5,000 FIRST AND LAST MONTH RENT

8.    **LEASEHOLD IMPROVEMENTS**: The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.


Tenant's Initials _____ Landlord's Initials _____

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.    **LICENSES AND PERMITS:** A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.    **OBLIGATIONS OF LESSEE:** The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.    **INSURANCE:** In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees

Tenant's Initials _____ Landlord's Initials _____

not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

12.    **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.    **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.    **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a
LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

Tenant's Initials _____ Landlord's Initials _____

15.   **INDEMNIFICATION:** The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.   **BANKRUPTCY - INSOLVENCY:** The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.   **SUBORDINATION AND ATTORNMENT:** Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.   **MISCELLANEOUS TERMS:**

I.   Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

II.   Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first

Tenant's Initials _____ Landlord's Initials _____

approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.

III. Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV. Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V. Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.    **ESTOPPEL CERTIFICATE:** Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.    **HOLDOVER:** Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.    **WAIVER:** Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.    **GOVERNING LAW:** This Lease shall be governed by the laws of the State of California.

23.    **NOTICES:** Payments and notices shall be addressed to the following:

Lessor          2203 S. ALAMEDA ST.
                LOS ANGELES, CA 90058


Lessee          _____
                _____


Tenant's Initials _____ Landlord's Initials _____

24.     **AMENDMENT**: No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

25.     **BINDING EFFECT**: This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.

IN WITNESS WHEREOF, the parties hereto set their hands and seal this _____ day of MARCH, 2019.

**LESSEE**

_____
Signature

KIM   K! JOONG
**Printed Name**

**CENTRAL METAL INC**

_____
Signature

Ong Uk Byun.
**Printed Name**

Tenant's Initials _____ Landlord's Initials _____

# Exhibit "F"

# CALIFORNIA COMMERCIAL LEASE

This Lease Agreement made by and between Central Metal Inc., hereinafter referred to as "Lessor", and ___Jong Uk Byun___ hereinafter referred to as "Lessee", collectively referred to herein as the "Parties", agree as follows:

1.     **DESCRIPTION OF LEASED PREMISES:** The Lessor agrees to lease to the Lessee the following described: <u>INDUSTRIAL SPACE LOCATED AT 24399 State Highway 58 Hinkley Ca 92347</u>. Hereinafter known as the "Premises".

2.     **USE OF LEASED PREMISES:** The Lessor is leasing the Premises to the Lessee and the Lessee is hereby agreeing to lease the Premises for the following use and purpose: STEEL FABRICATION. Any change in use or purpose the Premises shall be upon prior written consent of Lessor only

3.     **TERM OF LEASE:** The term of this Lease shall be for a period of <u>Five (5) year commencing on November 1st 2019 and expiring on November 1st 2024</u>. ("Initial Term"). If Property were to be sold before the 5-year agreement, a 3-month notice to move out will be delivered to the Lessee.

4.     **BASE RENT:** The net monthly payment shall be <u>TWO THOUSAND  DOLLARS ($2,000)</u>, payable monthly with the first payment due upon the commencement of the Lease and each monthly installment payable thereafter on the 1ST day of each month. Said net monthly payment is hereafter referred to as the "Base Rent". Rent for any period during the term hereon, which is for less than 1 month shall be a pro-rata portion of the monthly rent.

5.     **OPTION TO RENEW:** OPEN

6.     **EXPENSES:** It is the intention of the Parties that this Lease shall be considered a "Modified Gross Lease".  In addition to the Base Rent, the Lessee is responsible for the following monthly expenses: LESSEE'S OWN UTILITIES AND MAINTENANCE OF LEASED SPACE INCLUDING ANY AND ALL IMPROVEMENTS

7.     **SECURITY DEPOSIT:** <u>$4000 FIRST AND LAST MONTH RENT</u>

8.     **LEASEHOLD IMPROVEMENTS:** The Lessee agrees that no leasehold improvements, alterations or changes of any nature, shall be made to the leasehold premises or the exterior of the building without first obtaining the consent of the Lessor in writing, which consent shall not be unreasonably withheld, and thereafter, any and all leasehold improvements made to the Premises which become affixed or attached to the leasehold Premises shall remain the property of the Lessor at the expiration or termination of this Lease Agreement. Furthermore, any leasehold improvements shall be made only in accordance with applicable federal, state or local codes, ordinances or regulations, having due regard for the type of construction of the building housing the subject leasehold Premises.

Nothing in the Lease shall be construed to authorize the Lessee or any other person acting for the Lessee to encumber the rents of the Premises or the interest of the Lessee in the Premises or any person under and through whom the Lessee has acquired its interest in the Premises with a mechanic's lien or any other type of encumbrance. Under no circumstance shall the Lessee be construed to be the agent, employee or representative of Lessor. In the event a lien is placed against

Tenant's Initials  Landlord's Initials

the Premises, through actions of the Lessee, Lessee will promptly pay the same or bond against the same and take steps immediately to have such lien removed. If the Lessee fails to have the Lien removed, the Lessor shall take steps to remove the lien and the Lessee shall pay Lessor for all expenses related to the Lien and removal thereof and shall be in default of this Lease.

9.    **LICENSES AND PERMITS**: A copy of any and all local, state or federal permits acquired by the Lessee which are required for the use of the Premises shall be kept on site at all times and shall be readily accessible and produced to the Lessor and/or their agents or any local, state, or federal officials upon demand.

10.    **OBLIGATIONS OF LESSEE**: The Lessee shall be primarily responsible whenever needed for the maintenance and general pickup of the entranceway leading into the Premises, so that this is kept in a neat, safe and presentable condition. The Lessee shall also be responsible for all minor repairs and maintenance of the leasehold Premises, particularly those items which need immediate attention and which the Lessees, or their employees, can do and perform on their own, including but not limited to, the replacement of light bulbs, as well as the normal repair and cleaning of windows, cleaning and clearing of toilets, etc., and the Lessee shall properly maintain the Premises in a good, safe, and clean condition. The Lessee shall properly and promptly remove all rubbish and hazardous wastes and see that the same are properly disposed of according to all local, state or federal laws, rules regulations or ordinances.

In the event the structure of the Premises is damaged as a result of any neglect or negligence of Lessee, their employees, agents, business invitees, or any independent contractors serving the Lessee or in any way as a result of Lessee's use and occupancy of the Premises, then the Lessee shall be primarily responsible for seeing that the proper claims are placed with the Lessee's insurance company, or the damaging party's insurance company, and shall furthermore be responsible for seeing that the building is safeguarded with respect to said damage and that all proper notices with respect to said damage, are made in a timely fashion, including notice to the Lessor, and the party or parties causing said damage. Any damage that is not covered by an insurance company will be the liability of the Lessee.

The Lessee shall, during the term of this Lease, and in the renewal thereof, at its sole expense, keep the interior of the Premises in as good a condition and repair as it is at the date of this Lease, reasonable wear and use excepted. This obligation would include the obligation to replace any plate glass damaged as a result of the neglect or acts of Lessee or her guests or invitees. Furthermore, the Lessee shall not knowingly commit nor permit to be committed any act or thing contrary to the rules and regulations prescribed from time to time by any federal, state or local authorities and shall expressly not be allowed to keep or maintain any hazardous waste materials or contaminates on the Premises. Lessee shall also be responsible for the cost, if any, which would be incurred to bring her contemplated operation and business activity into compliance with any law or regulation of a federal, state or local authority.

11.    **INSURANCE**: In the event the Lessee shall fail to obtain insurance required hereunder and fails to maintain the same in force continuously during the term, Lessor may, but shall not be required to, obtain the same and charge the Lessee for same as additional rent. Furthermore, Lessee agrees not to keep upon the Premises any articles or goods which may be prohibited by the standard form of fire insurance policy, and in the event the insurance rates applicable to fire and extended coverage covering the Premises shall be increased by reason of any use of the Premises made by Lessee, then Lessee shall pay to Lessor, upon demand, such increase in insurance premium as shall be caused by said use or Lessee's proportionate share of any such increase.

Tenant's Initials ____    Landlord's Initials ____

12.    **SUBLET/ASSIGNMENT**: The Lessee may not transfer or assign this Lease, or any right or interest hereunder or sublet said leased Premises or any part thereof without first obtaining the prior written consent and approval of the Lessor.

13.    **DAMAGE TO LEASED PREMISES**: In the event the building housing the Premises shall be destroyed or damaged as a result of any fire or other casualty which is not the result of the intentional acts or neglect of Lessee and which precludes or adversely affects the Lessee's occupancy of the Premises, then in every such cause, the rent herein set forth shall be abated or adjusted according to the extent to which the leased Premises have been rendered unfit for use and occupation by the Lessee and until the demised Premises have been put in a condition at the expense of the Lessor, at least to the extent of the value and as nearly as possible to the condition of the Premises existing immediately prior to such damage. It is understood, however, in the event of total or substantial destruction to the Premises that in no event shall the Lessor's obligation to restore, replace or rebuild exceed an amount equal to the sum of the insurance proceeds available for reconstruction with respect to said damage.

14.    **DEFAULT AND POSSESSION**: In the event that the Lessee shall fail to pay said rent, and expenses as set forth herein, or any part thereof, when the same are due and payable, or shall otherwise be in default of any other terms of said Lease for a period of more than 15 days, after receiving notice of said default, then the parties hereto expressly agree and covenant that the Lessor may declare the Lease terminated and may immediately re-enter said Premises and take possession of the same together with any of Lessee's personal property, equipment or fixtures left on the Premises which items may be held by the Lessor as security for the Lessee's eventual payment and/or satisfaction of rental defaults or other defaults of Lessee under the Lease. It is further agreed, that if the Lessee is in default, that the Lessor shall be entitled to take any and all action to protect its interest in the personal property and equipment, to prevent the unauthorized removal of said property or equipment which threatened action would be deemed to constitute irreparable harm and injury to the Lessor in violation of its security interest in said items of personal property. Furthermore, in the event of default, the Lessor may expressly undertake all reasonable preparations and efforts to release the Premises including, but not limited to, the removal of all inventory, equipment or leasehold improvements of the Lessee's, at the Lessee's expense, without the need to first procure an order of any court to do so, although obligated in the interim to undertake reasonable steps and procedures to safeguard the value of Lessee's property, including the storage of the same, under reasonable terms and conditions at Lessee's expense, and, in addition, it is understood that the Lessor may sue the Lessee for any damages or past rents due and owing and may undertake all and additional legal remedies then available.

In the event any legal action has to be instituted to enforce any terms or provisions under this Lease, then the prevailing party in said action shall be entitled to recover a reasonable attorney's fee in addition to all costs of said action.

Rent which is in default for more than FIVE days after due date shall accrue a LATE FEE of SIXTY SEVEN dollars ($67) per day until the amount is paid in full.

15.    **INDEMNIFICATION**: The Lessee hereby covenants and agrees to indemnify, defend and hold the Lessor harmless from any and all claims or liabilities which may arise from any cause whatsoever as a result of Lessee's use and occupancy of the Premises, and further shall indemnify the Lessor for any losses which the Lessor may suffer in connection with the Lessee's use and occupancy or care, custody and control of the Premises. The Lessee also hereby covenants and agrees to indemnify and

Tenant's Initials          Landlord's Initials

hold harmless the Lessor from any and all claims or liabilities which may arise from any latent defects in the subject Premises that the Lessor is not aware of at the signing of the lease or at any time during the lease term.

16.    **BANKRUPTCY - INSOLVENCY:** The Lessee agrees that in the event all or a substantial portion of the Lessee's assets are placed in the hands of a receiver or a Trustee, and such status continues for a period of 30 days, or should the Lessee make an assignment for the benefit of creditors or be adjudicated bankrupt; or should the Lessee institute any proceedings under the bankruptcy act or any amendment thereto, then such Lease or interest in and to the leased Premises shall not become an asset in any such proceedings and, in such event, and in addition to any and all other remedies of the Lessor hereunder or by law provided, it shall be lawful for the Lessor to declare the term hereof ended and to re-enter the leased land and take possession thereof and all improvements thereon and to remove all persons therefrom and the Lessee shall have no further claim thereon.

17.    **SUBORDINATION AND ATTORNMENT:** Upon request of the Lessor, Lessee will subordinate its rights hereunder to the lien of any mortgage now or hereafter in force against the property or any portion thereof, and to all advances made or hereafter to be made upon the security thereof, and to any ground or underlying lease of the property provided, however, that in such case the holder of such mortgage, or the Lessor under such Lease shall agree that this Lease shall not be divested or in any way affected by foreclosure, or other default proceedings under said mortgage, obligation secured thereby, or Lease, so long as the Lessee shall not be in default under the terms of this Lease. Lessee agrees that this Lease shall remain in full force and effect notwithstanding any such default proceedings under said mortgage or obligation secured thereby.
Lessee shall, in the event of the sale or assignment of Lessor's interest in the building of which the Premises form a part, or in the event of any proceedings brought for the foreclosure of, or in the event of exercise of the power of sale under any mortgage made by Lessor covering the Premises, attorn to the purchaser and recognize such purchaser as Lessor under this Lease.

18.    **MISCELLANEOUS TERMS:**

I.    Usage by Lessee: Lessee shall comply with all rules, regulations and laws of any governmental authority with respect to use and occupancy. Lessee shall not conduct or permit to be conducted upon the Premises any business or permit any act which is contrary to or in violation of any law, rules or regulations and requirements that may be imposed by any authority or any insurance company with which the Premises is insured, nor will the Lessee allow the Premises to be used in any way which will invalidate or be in conflict with any insurance policies applicable to the building. In no event shall explosives or extra hazardous materials be taken onto or retained on the Premises. Furthermore, Lessee shall not install or use any equipment that will cause undue interference with the peaceable and quiet enjoyment of the Premises by other tenants of the building.

II.    Signs: Lessee shall not place on any exterior door, wall or window of the Premises any sign or advertising matter without Lessor's prior written consent and the approval of the LOCAL AUTHORITY. Thereafter, Lessee agrees to maintain such sign or advertising matter as first approved by Lessor in good condition and repair. Furthermore, Lessee shall conform to any uniform reasonable sign plan or policy that the Lessor may introduce with respect to the building. Upon vacating the Premises, Lessee agrees to remove all signs and to repair all damages caused or resulting from such removal.



Tenant's Initials          Landlord's Initials

III. Pets: Unless otherwise stated in this Lease Agreement, the only pets that shall be allowed on the Premises are those needed legally due to a disability or handicap.

IV. Condition of Premises/Inspection by Lessee: The Lessee has had the opportunity to inspect the Premises and acknowledges with its signature on this lease that the Premises are in good condition and comply in all respects with the requirements of this Lease. Furthermore, the Lessor makes no representation or warranty with respect to the condition of the Premises or its fitness or availability for any particular use, and the Lessor shall not be liable for any latent or patent defect therein. Furthermore, the Lessee represents that Lessee has inspected the Premises and is leasing and will take possession of the Premises with all current fixtures present in their "as is" condition as of the date hereof.

V. Right of Entry: It is agreed and understood that the Lessor and its agents shall have the complete and unencumbered right of entry to the Premises at any time or times for purposes of inspecting or showing the Premises and for the purpose of making any necessary repairs to the building or equipment as may be required of the Lessor under the terms of this Lease or as may be deemed necessary with respect to the inspection, maintenance or repair of the building.

19.    **ESTOPPEL CERTIFICATE**: Lessee at any time and from time to time, upon at least ten (10) days prior notice by Lessor, shall execute, acknowledge and deliver to Lessor, and/or to any other person, firm or corporation specified by Lessor, a statement certifying that the Lease is unmodified and in full force and effect, or if the Lease has been modified, then that the same is in full force and effect except as modified and stating the modifications, stating the dates to which the fixed rent and additional rent have been paid, and stating whether or not there exists any default by Lessor under this Lease and, if so, specifying each such default.

20.    **HOLDOVER**: Should Lessee remain in possession of the Premises after the cancellation, expiration or sooner termination of the Lease, or any renewal thereof, without the execution of a new Lease or addendum, such holding over in the absence of a written agreement to the contrary shall be deemed, if Lessor so elects, to have created and be construed to be a tenancy from month to month, terminable upon thirty (30) days' notice by either party.

21.    **WAIVER**: Waiver by Lessor of a default under this Lease shall not constitute a waiver of a subsequent default of any nature.

22.    **GOVERNING LAW**: This Lease shall be governed by the laws of the State of California.

23.    **NOTICES**: Payments and notices shall be addressed to the following:

Lessor

Lessee        _____

_____

24.    **AMENDMENT**: No amendment of this Lease shall be effective unless reduced to writing and subscribed by the parties with all the formality of the original.

25.    **BINDING EFFECT**: This Lease and any amendments thereto shall be binding upon the Lessor and the Lessees and/or their respective successors, heirs, assigns, executors and administrators.



Tenant's Initials            Landlord's Initials

IN WITNESS WHEREOF, the parties hereto set their hands and seal this 1ST day of November, 2019.

**LESSEE**
Jong Uk Byun

_____
Signature

_____
Printed Name

**LESSOR**
**CENTRAL METAL INC.**

_____
Signature

_____
Printed Name

Tenant's Initials _____    Landlord's Initials _____

# Exhibit "2"

Real Property Equity Chart - Jong Uk Byun

| Property | Estimate of Value# | Liens | Original Amount or Estimated Amount of Claim | Equity | Date Recorded | Source of Claim |
|---|---|---|---|---|---|---|
| Property is made up of 9 parcels APNs 6202-037-004, 6202-037-006, 6202-037-009, 6202-037-010, 6202-036-009, 6202-036-010, 6202-036-011, 6202-036-012, 6202-036-013. | $ 27,750,000.00 | LA County Tax Collector | $ 1,373,521.04 | | | Statutory Lien |
| 8201 Santa Fe Ave Huntington Park, CA 90255 | | Hyundai Steel Company | $ 24,010,014.19 | | 2/9/2015 | DoT |
| | * | Packo Investments | $ 1,450,000.00 | | 10/12/2016 | DoT |
| | | Soo Yeong Kim, Yeon Shim Song | $ 50,000.00 | | 11/15/2016(LA) | Judgment (LA County & San Bernardino) |
| ALL | | Toni Ko | $ 943,313.50 | | 4/5/2017 | Judgment |
| ALL | | Southern Counties Oil, Inc. | $ 10,632.99 | | 6/13/2017 | Judgment |
| Parcels 6202-037 - 004 , 006,009,010 | | BFS West, Inc. | $ 313,465.02 | | 9/14/2017 | UCC1 |
| Parcels 6202-037 - 004 , 006,009,010 | | Kap Chan Chong | $ 48,114.20 | | 9/26/2017 | DoT |
| | | Allen Park | $ 100,000.00 | | 12/5/2017 | DoT |
| Parcels 6202-037 - 004 , 006,009,010 | | Complete Business Solutions Group Inc. | $ 441,725.80 | | 1/12/2018 | Judgment |
| Parcels 6202-037 - 004 , 006,009,010 | * | Mohamed Sarfaz | $ 500,000.00 | | 1/18/2018 | DoT |
| Parcels 6202-037 - 004 , 006,009,010 | * | Bae Family Trust | $ 940,000.00 | | 1/18/2018 | DoT |
| | | LA County Tax Collector** | $ - | | | Statutory Lien |
| **Subtotals** | $ 27,750,000.00 | | $ 30,180,784.74 | -$2,430,784.74 | | |

# A value of specific collateral for each claimholder will have to be established for confirmation.
*These liens had their claim amount reduced by the sale of 144 & 146 G street as denoted in the payoff statement dated Feb 6, 2020
**LA County Tax Collector filed Proof of Claim No. 2 in this case. The proof of claim states that it is not secured by real property and is recorded under Central Metal, Inc.

| Property | Estimate of Value# | Liens | Original Amount or Estimated Amount of Claim | Equity | Date Recorded | Source of Claim |
|---|---|---|---|---|---|---|
| 1736 East 24th Street, Los Angeles, CA 90058 APN 5167-015-067 | $ 4,500,000.00 | LA County Tax Collector | $ 1,373,521.04 | | | Statutory Lien |
| | | Hyundai Steel Company | $ 24,010,014.19 | | 2/9/2015 | DoT |
| | | Packo Investments | $ 1,450,000.00 | | 10/12/2016 | DoT |
| | * | Soo Yeong Kim, Yeon Shim Song | $ 50,000.00 | | 11/15/2016 (LA) | Judgment (LA County & San Bernardino) |
| | | Toni Ko | $ 943,313.50 | | 4/5/2017 | Judgment |
| | | Southern Counties Oil, Inc. | $ 10,632.99 | | 6/13/2017 | Judgment |
| | | BFS West, Inc. | $ 313,465.02 | | 9/14/2017 | UCC1 |
| | | Kap Chan Chong | $ 48,114.20 | | 9/26/2017 | DoT |
| | * | Allen Park | $ 100,000.00 | | 12/5/2017 | DoT |
| | | Complete Business Solutions Group Inc. | $ 441,725.80 | | 1/12/2018 | Judgment |
| | * | Bae Family Trust | $ 940,000.00 | | 1/18/2018 | DoT |
| | | LA County Tax Collector** | $ - | | | Statutory Lien |
| **Subtotals** | $ 4,500,000.00 | | $ 29,680,784.74 | $ (25,180,784.74) | | |

# A value of specific collateral for each claimholder will have to be established for confirmation.
*These liens had their claim amount reduced by the sale of 144 & 146 G street as denoted in the payoff statement dated Feb 6, 2020
**LA County Tax Collector filed Proof of Claim No. 2 in this case. The proof of claim states that it is not secured by real property and is recorded under Central Metal, Inc.

| Property | Estimate of Value# | Liens | Original Amount or Estimated Amount of Claim | Equity | Date Recorded | Source of Claim |
|---|---|---|---|---|---|---|
| 22013 S. Alameda Street, Los Angeles, CA 90058 2 parcels: APN's. 5167-015-064 and 5167-015-065 | $ 7,000,000.00 | LA County Tax Collector | $ 1,373,521.04 | | | Statutory Lien |
| | | Hyundai Steel Company | $ 24,010,014.19 | | 2/9/2015 | DoT |
| | | Packo Investments | $ 1,450,000.00 | | 10/12/2016 | DoT |
| | * | Soo Yeong Kim, Yeon Shim Song | $ 50,000.00 | | 11/15/2016 (LA) | Judgment (LA County & San Bernardino) |
| | | Toni Ko | $ 943,313.50 | | 4/5/2017 | Judgment |
| | | Southern Counties Oil, Inc. | $ 10,632.99 | | 6/13/2017 | Judgment |
| | | BFS West, Inc. | $ 313,465.02 | | 9/14/2017 | UCC1 |
| | | Kap Chan Chong | $ 48,114.20 | | 9/26/2017 | DoT |
| | * | Allen Park | $ 100,000.00 | | 12/5/2017 | DoT |
| | | Complete Business Solutions Group Inc. | $ 441,725.80 | | 1/12/2018 | Judgment |
| | * | Bae Family Trust | $ 940,000.00 | | 1/18/2018 | DoT |
| | | LA County Tax Collector** | $ - | | | Statutory Lien |
| **Subtotals** | $ 7,000,000.00 | | $ 29,680,784.74 | $ (22,680,784.74) | | |

## Real Property Equity Chart – Jong Uk Byun

| Property | Estimate of Value# | Liens | Original Amount or Estimated Amount of Claim | Equity | Date Recorded | Source of Claim |
|---|---|---|---|---|---|---|
| 24399 Old Highway 58, Hinkley, CA 92347 | $ 400,000.00 | Wilshire State Bank (assigned to VFC Partners 7 LLC) | $ 300,000.00 | | 4/9/2008 | DoT |
| | | Soo Yeong Kim, Yeon Shim Song* | $ 50,000.00 | | 11/17/2016 (SB) | Judgment (LA County & San Bernardino) |
| | | Tom Ko | $ 943,313.50 | | 4/5/2017 | Judgment (LA County Recording Only) |
| | | Southern Counties Oil, Inc. | $ 10,632.99 | | 6/13/2017 | Judgment |
| | | San Bernardino County*** | $ 56,635.33 | | | Statutory Lien |
| 34 acres- 2 parcels: APN's 0497-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 and 0497-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 | | | $ 356,635.33 | $ 43,364.67 | | |
| Equity - subtracting taxes and consensual liens | $ 400,000.00 | | | | | |

# Value of specific collateral for each shareholder will have to be established for confirmation.
* These liens had their claim amount reduced by the sale of 144 & 146 G street as denoted in the payoff statement dated Feb 6, 2020
*** LA County Tax Collector filed Proof of Claim No. 2 in this case. The proof of claim states that it is not secured by real property and is recorded under Central Metal, Inc.

| Property | Estimate of Value# | Liens | Original Amount or Estimated Amount of Claim | Equity | Date Recorded | Source of Claim |
|---|---|---|---|---|---|---|
| APN S10-7-015-063, 2445 S. Alameda Street, Los Angeles, CA 90058 | $ 3,500,000.00 | LA County Tax Collector | $ 1,373,521.04 | | 2/9/2015 | Statutory Lien |
| | | Hyundai Steel Company | $ 24,010,014.19 | | 10/12/2016 | DoT |
| | * | Packo Investments | $ 1,450,000.00 | | 11/15/2016 (LA) | Judgment (LA County & San Bernardino) |
| | | Soo Yeong Kim, Yeon Shim Song | $ 50,000.00 | | 4/5/2017 | Judgment |
| | | Tom Ko | $ 943,313.50 | | 6/13/2017 | Judgment |
| | | Southern Counties Oil, Inc. | $ 10,632.99 | | 9/14/2017 | LCC1 |
| | | BFS West, Inc. | $ 313,463.02 | | 9/26/2017 | Judgment |
| | | Kap Chun Chong | $ 48,114.20 | | 12/5/2017 | DoT |
| | | Allen Park | $ 100,000.00 | | 1/12/2018 | Judgment |
| | | Complete Business Solutions Group Inc. | $ 441,722.80 | | 1/18/2018 | DoT |
| | * | Bae Family Trust | $ 940,000.00 | | | DoT |
| | | LA County Tax Collector ** | $ - | | | Statutory Lien |
| | | | $ 29,680,784.74 | | | |
| Subtotals | $ 3,500,000.00 | | $ 30,537,420.07 | $ 12,612,579.93 | | |

# Value of specific collateral for each shareholder will have to be established for confirmation.
* These liens had their claim amount reduced by the sale of 144 & 146 G street as denoted in the payoff statement dated Feb 6, 2020
** LA County Tax Collector filed Proof of Claim No. 2 in this case. The proof of claim states that it is not secured by real property and is recorded under Central Metal, Inc.

| Global Totals (unique debts are not shaded) | $ 43,150,000.00 | | | | | |

# Exhibit "3"

**Subject:** CENTRAL METALS INC - INTERIM SAMPLING REPORT
**From:** "Mitguard, Matt" <Mitguard.Matt@EPA.GOV>
**Date:** 5/29/2020, 4:51 PM
**To:** Jong Byun <mabellazarit@live.com>

14

**CC:** Mabel Lazarit <mabellazarit@live.com>, young kim
<youngkim3203@gmail.com>, Marvin Sachse <marvin@brashind.com>, "Sullivan,
Julie" <sullivan.julie@epa.gov>, "Clements, Mindy" <clements.mindy@epa.gov>

Mr. Byun – Please find a transmittal letter along with an Interim Sampling Report ( ISR)  from EPA's assessment of your property. As you know, we are embarking on assessing possible soil contamination onto adjacent properties, possibly associated with wind-blown deposition from the Central Metal property.

We are providing this "interim" data for your property because our assessment of your property is completed and no further sampling of your property appears to be required for Superfund assessment purposes. EPA found little chemical contamination on your facility; however, the contaminated debris pile found on site suggested that over time, contamination from the facility, from similar debris piles,  may have been dispersed into area neighborhoods. Subsequent to area residential sampling this fall, we will conclude our assessment of whether potential Central Metal dust plumes over time have impacted area neighborhoods, thus making the site  eligible for Superfund listing, remediation via State options, or of no remedial consequence. The final Site Inspection Report is planned for Spring 2021.

If you have any questions or concerns, please contact me at 415 972 3096

Thank you Matt Mitguard – Site Assessment Manager.
---------------------------------------------------------------
Matt Mitguard
Superfund & Emergency Management Division
Tribal Land Cleanup & Remedial Support Branch
Site Assessment and Technical Support Section (SFD 6-1)
415-972-3096

──Attachments:──────────────────────────────────────────

| | |
|---|---|
| Central Metal - SI - Final Interim Sampling Report.pdf | 5.6 MB |
| CENTRAL METALS_TRANSMITTAL LETTER_INTERIM_May 2020.pdf | 222 KB |

8/19/2020, 3:57 PM

# Exhibit "4"

**JONG UK BYUN** *PROJECTED MONTHLY CASH FLOW*

| Income Source | Monthly |
|---|---|
| Jong's SSI | $1,392.00 |
| Rental Income - 8201 Santa Fe Ave* | $94,286.61 |
| Rental Income - 1736 E 24th St. | $20,800.00 |
| Rental Income - 2445 S. Alameda St. | $15,190.00 |
| Rental Income - 2203 S. Alameda St. | $41,000.00 |
| Rental Income - 24399 State Highway 58 | $2,000.00 |
| | |
| **Total Income** | ***$174,668.61*** |
| | |
| **Operating Expenses** | |
| **8201 Santa Fe Ave** | |
| Mortgage | $0.00 |
| 2nd Mortgage | $0.00 |
| Property Taxes | $9,399.25 |
| Utilities | $0.00 |
| Repairs/Maintenance | $0.00 |
| Insurance | $128.08 |
| Telephone, cable, and internet | $0.00 |
| | |
| | **$9,527.33** |
| | |
| **2203 S. Alameda Street** | |
| Mortgage | $0.00 |
| 2nd Mortgage | $0.00 |
| Property Taxes | $1,610.77 |
| Utilities | $0.00 |
| Repairs/Maintenance | $0.00 |
| Insurance | $128.08 |
| Telephone, cable, and internet | $0.00 |
| | |
| | **$1,738.85** |
| | |
| **1736 East 24th Street** | |
| Mortgage | $0.00 |
| 2nd Mortgage | $0.00 |
| Property Taxes | $1,037.71 |
| Utilities | $0.00 |
| Repairs/Maintenance | $0.00 |
| Insurance | $128.08 |
| Telephone, cable, and internet | $0.00 |
| | |
| | **$1,165.79** |
| | |
| **2445 S. Alameda Street** | |
| Mortgage | $0.00 |
| 2nd Mortgage | $0.00 |
| Property Taxes | $757.91 |

| | |
|---|---:|
| Utilities | $0.00 |
| Repairs/Maintenance | $0.00 |
| Insurance | $128.08 |
| Telephone, cable, and internet | $0.00 |
| | |
| | **$885.99** |
| | |
| **24399 Old (State) Highway 58** | |
| Mortgage | $0.00 |
| 2nd Mortgage | $0.00 |
| Property Taxes | $517.25 |
| Utilities | $0.00 |
| Repairs/Maintenance | $0.00 |
| Insurance | $128.08 |
| Telephone, cable, and internet | $0.00 |
| | |
| | **$645.33** |
| | |
| | |
| **Expenditures of Debtor** | |
| Food | $1,000.00 |
| Rent | $2,000.00 |
| Clothing, Laundry and dry cleaning | $1,100.00 |
| Medical and dental expenses | $200.00 |
| Health Insurance | $135.50 |
| Board Fees | $0.00 |
| Life insurance | $247.00 |
| Supra E-Key | $0.00 |
| Personal care & personal grooming | $1,000.00 |
| School Expenses | $0.00 |
| Telephone | $200.00 |
| Transportation | $300.00 |
| Vehicle | $800.00 |
| Vehicle Insurance | $75.00 |
| Recreation, clubs, entertainment, etc. | $500.00 |
| | **$7,557.50** |
| | |
| **Net Income** | **$153,147.82** |

Fleet Yards Inc. will be signing an addendum adding to their rented
space by 66,331 sq. ft. at $0.33 per sq/ft at the 8201 Santa Fe property.

|  | $21,889.23 |
|---|---:|
| **Anticipated Net Income as of November 2020** | **$175,037.05** |

*Projected rent increase from Fleet yards rent space in approximately
12 months when the tenants obtains a full conditional use permit:   $67,740.42

**Projected Net Income in about 12 months**   **$242,777.47**

**Funds availalble as of Petition Date: $324,663.35**
*Debtor seeks the authority <u>not</u> the obligation to make payments set forth in the budget.

# Exhibit "5"

All Claims (Proposed Effective Date of Jong Uk Byun | 2:20-bk-17433-VZ

| Name | Acct # | Claim # | Scheduled Claim Amount | C/U/D | Filed Claim Amount | Value of Collateral | Allowed Claim Amount* | Objection/Comment to Filed Proofs of Claims | Monthly Payment | Total Payment |
|---|---|---|---|---|---|---|---|---|---|---|
| **ADMINISTRATIVE EXPENSES** | | | | | | | | | | |
| Orantes Law Firm | | | | | | | | To be determined during bankruptcy case | $0.00 | |
| Office of the United States Trustee | | | | | | | | Usually paid in full in ordinary course of business | $0.00 | |
| TOTAL | | | | | | | | | $0.00 | 0 |
| | | | | | | | | | Paid over 360 Months | |
| **Schedule D - Secured Claims** | | | | | | | | | | |
| Adv. Fin./Grand Pacific | 5605H | | unknown | | | | $0.00 | Time Share | $0.00 | 0 |
| Allen Park | | | $100,000.00 | U | | $27,750,000.00 | $100,000.00 | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $490.20 | $176,473.35 |
| Bae Family Trust | | | $940,000.00 | U/D | | $27,750,000.00 | $940,000.00 | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, Los Angeles, CA 90058 - Motion to Disallow will be Filed. | $4,607.92 | $1,658,849.50 |
| Bank of America | 1392 | | $0.00 | | $0.00 | $0.00 | $0.00 | 24399 Old Highway 58 Hinkley, CA 92347 | $1,470.61 | $529,420.05 |
| Bank of Hope | 1067 | | $300,000.00 | | | $400,000.00 | $300,000.00 | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $0.00 | $0.00 |
| BFS West, Inc. | 919 | | $0.00 | C/U | | $0.00 | $0.00 | | $0.00 | $0.00 |
| Complete Business Solutions Group | | | $346,534.96 | | | $27,750,000.00 | $346,534.96 | 8201 Santa Fe Ave,Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles, CA 90058 - Motion to Disallow. | $1,698.73 | $611,541.36 |
| Hyundai Steel Company | | | $17,500,000.00 | C/U/D | | $27,750,000.00 | $26,293,842.34 | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $128,893.40 | $46,401,624.59 |
| Kap Chan Chong | | | $48,114.20 | | | $0.00 | $48,114.20 | 1736 East 24th Street, Los Angeles, CA 90058, APN 5167-015-067; 2203 S. Alameda Street, Los Angeles, CA 90058, 3 parcels: APN's 5167-015-063, 5167-015-064 and 5167-015-065 - the Debtor may pay this claim early to avoid incurring more interest. | $235.86 | $84,908.74 |
| Los Angeles County Tax Collector | | 1 | $0.00 | | $1,373,521.04 | | $1,166,173.85 | Debtor will object to this claim as not his on its face because, among other things, it claims to be "Secured by a lien on property" but describes the property as "Tax Lien" and its own attachment explains lien is NOT on property of this Debtor nor is the debt under his name. | $17,315.50 | $6,233,581.07 |
| Los Angeles County Tax Collector | | 2 | $0.00 | | $1,235,887.32 | | $0.00 | Amount, if any, still owed is unclear. Collateral was only 8201 Santa Fe Ave, Huntington Park, CA 90255 | $0.00 | $0.00 |
| M&A Equities, LLC | | | $0.00 | | $0.00 | $0.00 | | | $0.00 | $0.00 |
| Mohamed Sanfaz | | | $0.00 | U | $0.00 | $0.00 | | Amount, if any, still owed is unclear. 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058 | $0.00 | $0.00 |
| Packo Investments | | | $2,450,000.00 | D | $0.00 | $0.00 | | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $0.00 | $0.00 |
| Select Portfolio Servicing, Inc | 3116 | | $0.00 | | $0.00 | $0.00 | | | $0.00 | $0.00 |
| Soo Yeong Kim | | | $0.00 | U/D | $0.00 | $0.00 | | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $0.00 | $0.00 |
| Southern Counties Oil, Co. | 1916 | 4 | $0.00 | U | $14,213.24 | | $14,213.24 | Judgment for Goods Sold | $69.67 | $25,082.58 |
| Southern Counties Oil, Inc. | | | $0.00 | | | | $0.00 | 8201 Santa Fe Ave, Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058; 2203 S. Alameda Street, Los Angeles Ca 90058; 2445 S. Alameda Street, CA 90058 | $0.00 | $0.00 |

| Name | Acct # | Claim # | Scheduled Claim Amount | C/U /D | Filed Claim Amount | Value of Collateral | Allowed Claim Amount* | Objection/Comment to Filed Proofs of Claims | Monthly Payment | Total Payment |
|---|---|---|---|---|---|---|---|---|---|---|
| Tor- Ko | 7471 | | $943,313.50 | U | | | $0.00 | 8201 Santa Fe Ave., Huntington Park, CA 90255, 1736 East 24th Street, Los Angeles, CA 90058, 22013 S. Alameda Street, Los Angeles, Ca 90058; 2445 S. Alameda Street, CA 90058 | $0.00 | $0.00 |
| Wells Fargo Bank NA | 6339 | | $0.00 | | $0.00 | | $0.00 | Secured credit card | $0.00 | $0.00 |
| Wells Fargo Dealer Services | 6821 | 3 | $15,632.00 | | $15,351.27 | | $15,351.27 | 2017 Honda Ridgeline | $295.31 | $17,718.39 |
| Veon Shim Song | | | $0.00 | U/D | $0.00 | | $0.00 | The Debtor's plan may propose for this monthly payment amount to be lower for a number of months while the Debtor's rental income from 8021 Santa Fe increases by about $67,740.42 approximately after August 2021, as anticipated. | $0.00 | $0.00 |
| TOTAL | | | $21,643,594.66 | | $2,638,972.87 | $111,400,000.00 | $29,224,229.86 | | $155,077.20 Payable 5 years from 8/14/20 | $55,739,200.22 |
| **Schedule E - Unsecured Priority Claims** | | | | | | | | | | |
| Employment Development Department | | | $0.00 | | $0.00 | | $0.00 | For Notice Purpose Only | $0.00 | $0.00 |
| Franchise Tax Board | | | $0.00 | | $0.00 | | $0.00 | For Notice Purpose Only | $0.00 | $0.00 |
| Internal Revenue Service | | 8 | $0.00 | | $15,947.41 | | $15,947.41 | Paid over 54 months | $372.77 | $17,519.96 |
| Los Angeles County Tax Collector | | 5 | $0.00 | | $1,373,521.04 | | $207,347.19 | Priority portion (507(a)(8)(B)) paid over 54 months -1736 East 24th Street, Los Angeles, CA 90058, APN 5167-015-067; 22013 S. Alameda Street, Los Angeles, CA 90058, 3 parcels: APN's 5167-015-063, 5167-015-064 and 5167-015-065 - the Debtor may pay this claim early to avoid incurring more interest. | $5,546.56 | $1,996,763.09 |
| San Bernardino County Tax Collector | | | unknown | | $56,635.33 | | $56,635.33 | Paid over 54 months - 24399 Old Highway 58 Hinkley, CA 92347 | $1,031.00 | $58,914.09 |
| State Board of Equalization | | | $0.00 | | $0.00 | | $0.00 | For Notice Purpose Only | $0.00 | $0.00 |
| U.S. Small Business Administration | | | $0.00 | | $0.00 | | $0.00 | For Notice Purpose Only | $0.00 | $0.00 |
| | | | | | | | | The Debtor's plan may propose for this monthly payment amount to be lower for a number of months while the Debtor's rental income from 8021 Santa Fe increases by about $67,740.42 approximately after August 2021, as anticipated. | | |
| TOTAL | | | $0.00 | | $15,947.41 | | $15,947.41 | | $57,010.33 Paid over 60 months | $2,073,197.14 |
| **Schedule F - General Unsecured Nonpriority Claims** | | | | | | | | | | |
| American Express | 9544 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Bank of America | | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Bojac | | | unknown | | | | unknown | | $0.00 | $0.00 |
| BMW Bank of North America | 955 | | unknown | | | | unknown | | $0.00 | $0.00 |
| Box Sock Byun | | | unknown | | | | unknown | | $0.00 | $0.00 |
| California Dept. of Tax and Fee Administration | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Capital One | 308 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Capital One | 5259 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Capital One | 1250 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Capital One | 4786 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Capital One | 7794 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Capital One/Saks F | 4862 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Cemex Construction Materials | | | unknown | | | | unknown | | $0.00 | $0.00 |
| City of Los Angeles | | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Coleman & Horowitz, LLP | 5895 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| CP Construction | | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Creditors Adjustment | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Daniel Park | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Deutsche Bank National Trust Co. | 3895 | | $221,246.63 | | | | $221,246.63 | | $3,687.44 | $221,246.63 |
| DU Assets Bravo, LLC | 6185 | | $160,025.74 | | | | $160,025.74 | | $2,667.10 | $160,025.74 |
| DTSC- Site Clean Up Program | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Eisner Jaffe | 5207 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| First Premier Bank | 6301 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| First Progress | | | unknown | | | | unknown | | $0.00 | $0.00 |
| First Savings Bank/Blaze | 810 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Genesis FS Card Services | 6465 | 8 | $6,465.00 | | $6,465.00 | | $6,465.00 | | $107.75 | $6,465.00 |

| Name | Acct # | Claim # | Scheduled Claim Amount | C/U /D | Filed Claim Amount | Value of Collateral | Allowed Claim Amount* | Objection/Comment to Filed Proofs of Claims | Monthly Payment | Total Payment |
|---|---|---|---|---|---|---|---|---|---|---|
| Hose-Man | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Jinah Oh | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Joan Park | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Jourdan DeWard | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Municipal Services Bureau | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Ocwen Loan Servicing | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Par Funding | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Prima Financial | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Resnik, Hayes, Moradi, LLP | 1067 | 9 | $85,000.00 | | | | $74,859.50 | | $1,247.66 | $74,859.50 |
| Sequoia Financial Services | | | $596.25 | | | | $596.25 | | $9.94 | $596.25 |
| Small Business Administration | | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| State Compensation Insurance Fund | 1418 | 6 | $0.00 | | $184,726.52 | | $184,726.52 | | $3,078.78 | $184,726.52 |
| Stephen M. Cook | | | unknown | | | | unknown | | $0.00 | $0.00 |
| Synchrony Bank/Amazon | 9116 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Synchrony Bank/Chevron | 3356 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| The Bank of Missouri/Milestone | 6465 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| US Bank/RMS CC | 8969 | | $0.00 | | | | $0.00 | | $0.00 | $0.00 |
| Zamucen & Curren, LLP | | | unknown | | | | unknown | The Debtor's plan may propose to pay over a period longer than 60 months and/or for this monthly payment amount to be lower for a number of months while the Debtor's rental income from 8021 Santa Fe increases by about $67,740.42 approximately after August 2021, as anticipated. | | |
| TOTAL | | | $466,868.62 | | $191,191.52 | | $647,919.64 | | $10,798.66 | $647,919.64 |
| Leases | | | | | | | | | | |
| None | | | $0.00 | | $0.00 | | 0 | | $0.00 | $0.00 |
| GRAND TOTAL | | | | | | | | | | $172,886.19 |

* Unless a proof of claim has been filed and the Debtor does not indicate that a motion to disallow will be filed, amounts are estimates.

## DECLARATION OF KIRK GARABEDIAN

I, Kirk Garabedian, hereby declare and state as follows:

1. I am over the age of 18 years. Except when based on information and belief, the facts stated herein are within my personal knowledge and if I am called upon to testify, I could and would do so competently thereto.

2. I am the Director of Commercial Property Investments. I am a licensed real estate broker under the laws of the state of California. I was the listing agent for the Debtor of the real property located at 8201 Santa Fe Ave. Huntington Park, CA 90255 property (the "Santa Fe Property"). I was employed by Keller Williams Commercial at the time of this listing in June 2018. I have specialized in selling commercial real property in the greater Southern California area since 2005.

3. Attached hereto collectively as Exhibit "1" are true and correct copies of the Standard Offer, Agreement and Escrow Instructions For Purchase of Real Estate as well as the supporting escrow documents.

4. This escrow was cancelled due to the various environmental challenges with the Environmental Protection Agency at the time and the lack of clarity at the time as well as the unresolved and pending litigation/arbitration matters. The buyers felt that it was just too complicated and risky to spend time and resources for further investigations; additionally, they were concerned the property would not be deliverable given the legal complications and, therefore, decided to cancel escrow.

5. It is my opinion that, given the further clarity of the environmental situation today, and the published reports/testing conducted by the EPA, the selling party is in a much stronger position to be able to garner a similar offer with better terms and conditions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 8, 2020 at Los Angeles County, California.

Kirk Garabedian, Declarant

-1-

# Exhibit "1"



AIR

## STANDARD OFFER, AGREEMENT AND ESCROW INSTRUCTIONS
## FOR PURCHASE OF REAL ESTATE
(Vacant Land)

Dated: June 18, 2018

**1. Buyer.**

1.1 _____ Alere Property Group LLC, a Delaware limited liability company _____ , ("**Buyer**") hereby offers to purchase the real property, hereinafter described, from the owner thereof ("**Seller**") (collectively, the "**Parties**" or individually, a "**Party**"), through an escrow ("**Escrow**") to close on or 15 days after the waiver or expiration of the Environmental Contingency Period Buyer's Contingencies, ("**Expected Closing Date**") to be held by _____ First American Title Insurance Company _____ ("**Escrow Holder**") whose address is _____ 3281 E. Guasti Rd., Suite 440, Ontario, CA 91761; ATTN: Matt Flixter _____ , Phone No. 909-810-6243 , Facsimile No. Email: mflixter@firstam.com upon the terms and conditions set forth in this agreement ("**Agreement**"). Buyer shall have the right to assign Buyer's rights hereunder, but any such assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.

1.2 The term "**Date of Agreement**" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.

**2. Property.**

2.1 The real property ("**Property**") that is the subject of this offer consists of (insert a brief physical description) _____ approximately 11.27 acres of vacant land _____ is located in the County of _____ Los Angeles _____ , is commonly known as (street address, city, state, zip) _____ 8201 Santa Fe Road, Huntington Park, California _____ and is legally described as: _____ Title Company to provide _____ (APN: Title Company to provide )

2.2 If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected to meet the requirements of _____ First American Title Insurance Company _____ ("**Title Company**"), which shall issue the title policy hereinafter described.

2.3 The Property includes, at no additional cost to Buyer, the permanent improvements thereon, including those items which pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: _____ None _____ (collectively, the "**Improvements**").

2.4 Except as provided in Paragraph 2.3, the Purchase Price does not include Seller's personal property, furniture and furnishings, and _____ None _____ all of which shall be removed by Seller prior to Closing.

**3. Purchase Price.**

3.1 The purchase price ("**Purchase Price**") to be paid by Buyer to Seller for the Property shall be _____ $29,000,000.00 _____ or _____ (complete only if purchase price will be determined based on a per unit cost instead of a fixed price) _____ per unit. The unit used to determine the Purchase Price shall be:

☐ lot   ☐ acre   ☐ square foot   ☐ other _____ (prorating areas of less than a full unit). The number of units shall be based on a calculation of total area of the Property as certified to the Parties by a licensed surveyor in accordance with paragraph 9.1(g). However, the following rights of way and other areas will be excluded from such calculation. _____ . The Purchase Price shall be payable as follows:

_(Strike any not applicable)_

(a) Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all cash transaction, the Purchase Price):                    $29,000,000.00

(b) Amount of "New Loan" as defined in paragraph 5.1, if any.                                                                          _____

(c) Buyer shall take title to the Property subject to and/or assume the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Notes"):
Do an existing Note ("**First Note**") with a current principal balance and the Delinquent approximately.                                _____

(i)    Said First Note is payable at $ _____ per month, including interest at the rate of _____ % per annum with First Note due the entire unpaid balances due on _____ .                                                                                                                       _____

(ii)   An Existing Note ("**Second Note**") with an unpaid principal balance as of the Closing of approximately.                      _____

(iii)  Said Second Note is payable at $ _____ per month, including interest at the rate of _____ % per annum with Second Note due the entire unpaid balance is due on _____ .                                                                                        _____

(d)   Buyer shall give Seller a deed of trust ("**Purchase Money Deed of Trust**") on the property, to secure the promissory note ("**Purchase Money Note**") of Buyer in the amount of:                                                                                          _____

3.2 If Buyer is taking title to the Property subject to, or assuming, an Existing Deed of Trust and said deed of trust permits the beneficiary to demand payment of fees including but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a...

INITIALS                                                                                                                                                      INITIALS

© 2017 AIR CRE. All Rights Reserved.                                                                                   OFAL-15.00, Revised 01-03-2017

maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.

4.  Deposits.

4.1    Buyer has delivered to Broker a check in the sum of _____ , payable to Escrow Holder, to be delivered by Broker to Escrow Holder within 2 or business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or within 2 or

____3____  business days after both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder. Buyer shall deliver to Escrow Holder a wire transfer check in the sum of   8500,000.00   . If said  wire transfercheck is not received by Escrow Holder within said time period then Seller may elect to unilaterally terminate this transaction by giving written notice of such election to Escrow Holder whereupon neither Party shall have any further liability to the other under this Agreement. Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2    Additional deposits:  None.

(a)   Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of _____ to be applied to the Purchase Price at the Closing.

(b)   Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (m) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of _____ to be applied to the Purchase Price at the Closing.

(c)   If an Additional Deposit is not received by Escrow Holder within the time period, provided then Seller may notify Buyer, Escrow Holder, and Brokers, in writing that, unless the Additional Deposit is received by Escrow Holder within 3 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

4.3    Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is   61-3453689   . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

4.4    Notwithstanding the foregoing, within 5 days after Escrow Holder receives the monies described in paragraph 4.1 above, Escrow Holder shall release $100 of said monies to Seller as and for independent consideration for Seller's' execution of this Agreement and the granting of the contingency period to Buyer as herein provided. Such independent consideration is non-refundable to Buyer but shall be credited to the Purchase Price in the event that the purchase of the Property is completed.

4.5    Upon waiver of all of Buyer's contingencies the Deposit shall become non-refundable but applicable to the Purchase Price except in the event of a Seller breach, or in the event that the Escrow is terminated pursuant to the provisions of Paragraph 9.1(n) (Destruction, Damage or Loss) or 9.1(o) (Material Change), or in the event any other condition for Buyer's benefit fails to occur, or as otherwise expressly provided in this Agreement.

5.    Financing Contingency.  (Strike if not applicable)

5.1   This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least _____ % of the Purchase Price, on terms reasonably acceptable to Buyer. Such loan ( "New Loan" ) shall be secured by a first deed of trust or mortgage on the Property. If the Agreement provides for Seller to carry back jumbo financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.

5.2   Buyer hereby agrees to diligently pursue obtaining the New Loan.  If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in writing within _____ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.

5.3   If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.

6.    Seller Financing.  (Purchase Money Notes).  (Strike if not applicable)

6.1   If Seller approves Buyer's financials (see paragraph 6.5) the Purchase Money Note shall provide for interest on unpaid principal at the rate of _____ % per annum, with principal and interest paid as follows: _____ . The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the New Loan referenced and/or the Existing Note expressly called for by this Agreement.

6.2   The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 11.3 (b)):

(a)   Prepayment.  Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.

(b)   Late Charge.  A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.

(c)   Due On Sale.  In the event the Buyer sells or transfers title in the Property, or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.

6.3   If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense, prepare and record on Seller's behalf a request for notice of default within said time period to each mortgage or deed of trust to which it will be subordinate.

6.4   WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.

6.5   Seller's obligation to provide financing is contingent upon Seller's reasonable approval of Buyer's financial condition. Buyer to provide a current financial statement and copies of its federal tax returns for the last 3 years to Seller within 10 days following the Date of Agreement. Seller has 10 days following receipt of such documentation to satisfy itself with regard to Buyer's financial condition and to notify Escrow Holder, in writing, if Buyer's financial condition is not acceptable. If Seller fails to notify Escrow Holder, in writing, of the disapproval of the contingency within said time period, it shall be conclusively presumed that Seller has approved Buyer's financial condition. If Seller is not satisfied with Buyer's financial condition, it shall have to deliver the required documentation from Seller, may notify Escrow Holder, in writing, that Seller's financing will not be available, and Buyer shall thereupon, at least within 10 days of the receipt of such notice, to either terminate this transaction or to purchase the Property without Seller financing. If Buyer fails to notify Escrow Holder within said time period of its election to terminate this transaction then Buyer shall be conclusively presumed to have elected to purchase the Property without Seller financing. If Buyer elects to terminate, Buyer's Deposit shall be returned less Title Company and Escrow holder cancellation fees and costs, all of which shall be Buyer's obligation.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved

OFAL-15.00, Revised 01-03-2017

**7.    Real Estate Brokers.**

7.1    The following real estate broker(s) ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes):

_KW Commercial and Packs Investments, Inc._ represents Seller exclusively ("**Seller's Broker**");

_____ represents Buyer exclusively ("**Buyer's Broker**"); or

_____ represents both Seller and Buyer ("**Dual Agency**").

The Parties acknowledge that other than the Brokers listed above, there are no other brokers representing the Parties or due any fees and/or commissions under this Agreement. See paragraph 24 regarding the nature of a real estate agency relationship. Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the date inserted for reference purposes at the top of page 1.

7.2    Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.

**8.    Escrow and Closing.**

8.1    Upon acceptance hereof by Seller, this Agreement, including any counteroffers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow.  Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions. In the event that there is any conflict between the provisions of the Agreement and the provisions of any additional escrow instructions the provisions of the Agreement shall prevail as to the Parties and the Escrow Holder.

8.2    As soon as practical after the receipt of this Agreement and any relevant counteroffers, Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 and 20.2 and advise the Parties and Brokers, in writing, of the date ascertained.

8.3    Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder the Property is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

8.4    **Subject to satisfaction of the contingencies herein described**, Escrow Holder shall close this escrow (the "**Closing**") by recording a general warranty deed (a grant deed in California) and the other documents required to be recorded, and by disbursing the funds and documents in accordance with this Agreement.

8.5    Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance and Buyer shall pay the premium for any extended title coverage and title endorsements. (See also paragraph 11).

8.6    Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing.  The matters contained in paragraphs 9.1 subparagraphs (b), (c), (d), (e), (g), (i), (n), and (o), 9.4, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however, matters of agreement between the Parties only and are not instructions to Escrow Holder.

8.7    If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement.  In the event of such termination, Buyer shall, subject to the provisions of paragraph 8.10, be promptly refunded all funds deposited by Buyer with Escrow Holder, less only the $100 provided for in paragraph 4.4 and the Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation. If this transaction is terminated as a result of Seller's breach of this Agreement then Seller shall pay the Title Company and Escrow Holder cancellation fees and costs.

8.8    The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9    Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10    If this sale of the Property is not consummated for any reason other than Seller's breach or default, then at Seller's request, and as a condition to the obligation to return Buyer's deposit (see paragraph 21), Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others.

**9.    Contingencies to Closing.**

9.1    The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies as determined in Buyer in its sole discretion. IF BUYER FAILS TO NOTIFY ESCROW HOLDER, IN WRITING, OF THE DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS APPROVED SUCH ITEM, MATTER OR DOCUMENT.  Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives.  With regard to subparagraphs (a) through (m) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided.

(a)    *Disclosure.* Seller shall make to Buyer, through Escrow, all of the applicable disclosures required by law (See AIR CRE ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement") and provide Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in the current form or equivalent to that published by the AIR within 10 or ___X___ business days following the Date of Agreement.  Buyer has 10/15 days from the Reference Date (which runs from this period is referred to in this Agreement as the "Due Diligence Period") a period of said notification to approve or disapprove the matters disclosed.

INITIALS                                                                                                                                INITIALS

© 2017 AIR CRE.  All Rights Reserved.
OFAL-15.00. Revised 01-03-2017

(b)  *Physical Inspection.*  Buyer has 10 or ___60___ days following the Forbearance Date receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property and the economic feasibility of its investment in the Property.

(c)  *Hazardous Substance Conditions Report.*  Buyer has 20 or ___60___ days following the Forbearance Date receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "**Hazardous Substance**" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare. A "**Hazardous Substance Condition**" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d)  *Soil Inspection.*  Buyer has 10 or ___60___ days following the Forbearance Date receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 3 business days following the Date of Agreement.

(e)  *Governmental Approvals.*  Buyer has 10 or ___60___ days following the Forbearance Date to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters. NOTE: Past uses of the Property may no longer be allowed. In the event that the Property must be rezoned, it is Buyer's responsibility to obtain the rezoning from the appropriate government agencies. Seller shall sign all documents Buyer is required to file in connection with rezoning, conditional use permits and/or other development approvals.

(f)  *Conditions of Title.*  Escrow Holder shall cause a current commitment for title insurance ("**Title Commitment**") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Commitment ("**Underlying Documents**"), and a scaled and dimensioned plot showing the location of any easements to be delivered to Buyer within 10 or ___-- -___ days following the Date of Agreement. Buyer has 10 60 days from the receipt of the Title Forbearance Date Commitment, the Underlying Documents and the plot plan to satisfy itself with regard to the condition of title. The disapproval by Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g)  *Survey.*  Buyer has 10 or ___60___ days following the receipt of the Title Commitment and Underlying Documents Forbearance Date to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("**ALTA**") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

(h)  *Existing Leases and Tenancy Statements.* Seller shall within 10 or _____ days following the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "**Existing Leases**") affecting the Property, and with a tenancy statement ("**Estoppel Certificate**") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.

(i)  *Owner's Association.* Seller shall within 10 or ___3 business___ days following the Date of Agreement provide Buyer with a statement and transfer package from owner's association servicing the Property. Such transfer package shall at a minimum include: copies of the association's bylaws, articles of incorporation, current budget and financial statement. Buyer has 10 60 days from the receipt of such documents Forbearance Date to satisfy itself with regard to the association.

(j)  *Other Agreements.* Seller shall within 10 or ___3 business___ days following the Date of Agreement provide Buyer with legible copies of all other agreements ("**Other Agreements**") known to Seller that will affect the Property after Closing and (1) any bills and other notices that pertain to any real estate taxes applicable to the Property for the current year and, if available, the five (5) years immediately preceding the Date of Agreement; (2) tax management, maintenance, landscaping or other service agreements affecting the Property and any other agreements relating to or affecting the Property; (3) all third party reports, including geotechnical reports, regarding soil conditions, ground water, wetlands, underground storage tanks, subsurface conditions and/or other environmental or physical conditions relating to the Property; (4) Seller's most recent owner's title policy issued in connection with the title with the Property and the most recent survey of the Property; (5) zoning reports and submissions and correspondence with zoning authorities regarding zoning matters; (6) any subdivision plans or plats, variances, parcel maps or development agreements relating to the Property and any licenses, permits, certificates, authorizations, and approvals issued by any governmental authority in connection with the construction, ownership, use and/or occupancy of the Property; and (7) any other documents relating to the Property as Buyer may reasonably request (collectively, the "Other Documents"). Buyer has 10 60 days from the Forbearance Date receipt of said Other Agreements to satisfy itself with regard to such Other Agreements and Other Documents.

(k)  *Financing.* If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.

(l)  *Existing Notes.* If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days following the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related documents (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days following the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is hereby conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges triggered by the assumption or "taking subject to" such loan. Seller shall promptly provide Buyer with a copy of any such documents as Buyer may reasonably request. (unreadable) If the purchase of the Property shall include a Purchase Money Note then Seller shall within 10 or _____ days following the Date of Agreement approve in writing a copy of the proposed Purchase Money Note and Purchase Money Deed of Trust. Buyer has 10 or _____ days from the receipt of such documents to satisfy itself with regard to the form and content thereof.

(m)  *Personal Property.* In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days following the Date of ...

<div style="display:flex;justify-content:space-between;">
INITIALS        <div style="text-align:center;">Page 4 of 10<br>Last Edited: 5/21/2018 2:55 PM</div>        INITIALS
</div>

© 2017 AIR CRE.  All Rights Reserved

OFAL-15.00, Revised 01-03-2017

Agreements to satisfy itself with regard to the title condition of such personal property.  Seller recommends that Buyer obtain a UCC-1 report.  Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days following the Date of Agreement.

(n).  Destruction, Damage or Loss.  Subsequent to the Date of Agreement and prior to Closing there shall not have occurred a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is more than $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing.  Buyer shall have the option within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this Agreement or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price.  If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this Agreement, Buyer shall be entitled to any insurance proceeds applicable to such loss.  Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.

(o)  Material Change.  Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change.  "**Material Change**" shall mean a substantial adverse change in the use, occupancy, tenants, title, or condition of the Property that occurs after the date of this offer and prior to the Closing.  Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(p)  Seller Performance.  The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(q)  Brokerage Fee.  Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("**Brokerage Fee**").  It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.

9.2  All of the contingencies specified in subparagraphs (a) through (m) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "**Buyer's Contingencies**."

9.3  If any of Buyer's Contingencies or any other matter subject to Buyer's approval is disapproved in Buyer's discretion within the applicable time period, this Agreement shall be terminated, the Deposit shall be returned to Buyer without further authorization or approval of Seller, and neither shall have the shall have any further rights, liabilities or other obligations under the Agreement. as provided for herein in a timely manner ("**Disapproved Item**"), Seller shall have the right within 10 days following the receipt of notice of Buyer's disapproval to cure such Disapproved Item prior to the Expected Closing Date ("**Seller's Election**"). Seller's failure to give Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item.  If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the right, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this Agreement.  Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this Agreement. The above time periods shall apply only for each Disapproved Item.  Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency.  Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for a business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Buyer may elect to cure the Disapproved Item, or (c) if Seller elects to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4  The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances.  The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers.  The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties, and Buyer and Seller are not relying upon any Investigation by or statement of Brokers with respect thereto.  The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

**10.  Documents Required at or Before Closing.**

10.1  Five days prior to the Closing date Escrow Holder shall obtain an updated Title Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2  Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:

(a)  Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer, subject only to real estate taxes not then due or payable, and such other exceptions to title as have been approved by Buyer.

(b)  If applicable, the Beneficiary Statements concerning Existing Note(s).

(c)  If applicable, the Existing Leases and Other Agreements (including any development agreements in effect with respect to the Property) together with duly executed assignments thereof by Seller and Buyer.  The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.

(d)  If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.

(e)  An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes.  If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.

(f)  If the Property is located in California, an affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes.  If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

(g)  If applicable, a bill of sale, duly executed, conveying title to any included personal property to Buyer.

(h)  If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3  Buyer shall deliver to Seller through Escrow

(a)  The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder in immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date provided, however, that Buyer shall not be required to deposit such monies into Escrow if at the time set for the deposit of such monies Seller is in default or has indicated that it will not perform any of its obligations hereunder.  Instead, in such circumstances in order to reserve its rights to proceed Buyer need only provide Escrow with evidence establishing that the required monies were available.

INITIALS                                                                                                    INITIALS

© 2017 AIR CRE.  All Rights Reserved
OFAL-15.00, Revised 01-03-2017

(b) If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents. The Purchase Money Deed of Trust being in recordable form, together with a policy of title insurance or the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a request to Escrow for a contract in Buyer's expense, desiring Seller of notice of the close of payment of real property taxes during the life of the Purchase Money Note.

(c) The Assignment and Assumption of Lessor's interest in Lease forms specified in paragraph 10.1(c) above, duly executed by Buyer.

(d) Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.

(e) If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.

(f) If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4 At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended coverage, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer and with such endorsements thereto as Buyer may require. Seller agrees to deliver documents customarily required by the Title Company for Closing and the issuance of an extended coverage ALTA owner's policy of title insurance, including, without limitation, an owner's affidavit, GAP indemnity and organizational documents. In the event there is a Purchase Money Deed of Trust in the transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

**11. Prorations and Adjustments.**

11.1 *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2 *Insurance.* **WARNING:** Any insurance which Seller may have maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

11.3 *Rentals, Interest and Expenses.* Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.

11.4 *Security Deposit.* Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.

11.5 *Post Closing Matters.* Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by appropriate cash payment outside of the Escrow when the amount due is determined.

11.6 *Variations in Existing Note Balances.* In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.

11.7 *Variations in New Loan Balance.* In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.

11.8 *Owner's Association Fees.* Escrow Holder shall: (i) bring Seller's account with the association current and pay any delinquencies or transfer fees from Seller's proceeds, and (ii) pay any up front fees required by the association from Buyer's funds.

**12. Representations and Warranties of Seller and Disclaimers.**

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed for a period of 1½ years, and any lawsuit or action based upon them must be commenced within such time period. Seller's warranties and representations are true, material and relied upon by Buyer and Brokers in all respects. Seller hereby makes the following warranties and representations to Buyer as of the Date of Agreement and as of the date of Closing and Brokers:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

(b) *Maintenance During Escrow and Equipment Condition At Closing.* Except as otherwise provided in paragraph 9.1(n) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted.

(c) *Hazardous Substances/Storage Tanks.* Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence on the Property of any Hazardous Substance, nor of the existence or prior existence of any above or below ground storage tank.

(d) *Compliance.* Seller has no knowledge of any aspect or condition of the Property which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property.

(e) *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any Existing Lease or Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f) *Possessory Rights.* There are no leases or other agreements in effect for the use of occupancy of the Property or any portion thereof, and Seller has no knowledge that anyone will, at the Closing, have any right to possession of the Property, except as disclosed by this Agreement or otherwise in writing to Buyer.

(g) *Mechanics' Liens.* There are no unsatisfied mechanics' or materialmens' lien rights concerning the Property.

(h) *Actions, Suits or Proceedings.* Except as otherwise set forth in Paragraph 20, Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(o)) affecting the Property that becomes known to Seller prior to the Closing.

(j) *No Tenant Bankruptcy Proceedings.* Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.

(k) *No Seller Bankruptcy Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l) *Personal Property.* Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.

© 2017 AIR CRE. All Rights Reserved.                                    OFA1-15.00, Revised 01-03-2017

12.2  Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in and, its contemplated use of, the Property.  The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.

12.3  In the event that Buyer learns that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

12.4  Any environmental reports, soils reports, surveys, feasibility studies, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk.  Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.

**13.  Possession.**
Possession of the Property shall be given to Buyer at the Closing ~~subject to the rights of tenants under Existing Leases.~~

**14.  Buyer's Entry.**
At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times ~~and subject to rights of tenants~~ to enter upon the Property for the purpose of performing such inspections and tests of the Property as Buyer may in its sole discretion require including, without limitation, Phase II and other environmental testing of the Property ~~making inspections and tests specified in the Agreement.  No destructive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld~~. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

**15.  Further Documents and Assurances.**
The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement.  The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

**16.  Attorneys' Fees.**
If any Party ~~or Broker~~ brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees and costs.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term "Prevailing Party" shall include, without limitation, a Party ~~or Broker~~ who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party ~~or Broker~~ of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

**17.  Prior Agreements/Amendments.**
17.1  This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.
17.2  Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

**18.  Broker's Rights.**
18.1  ~~If the sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated.  If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.~~
18.2  ~~Upon the Closing, Brokers are authorized to publicize the facts of this transaction.~~

**19.  Notices.**
19.1  Whenever any Party, Escrow Holder or Brokers herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger, or by mail, postage prepaid, to the address set forth in this agreement or by facsimile transmission, electronic signature, digital signature, or email.
19.2  Service of any such communication shall be deemed made on the date of actual receipt if personally delivered, or transmitted by facsimile transmission, electronic signature, digital signature, or email.  Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed.  Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier.  If such communication is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.
19.3  Any Party or Broker hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

**20.  Duration of Offer.**
20.1  ~~Unless this offer, is by its terms, revoked or accepted by Seller in the form of a duly executed copy bearing the Seller's signature delivered to Buyer by _____ on the day of _____ or withdrawn by Buyer, or otherwise automatically revoked.~~
20.2  The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.

**21.  LIQUIDATED DAMAGES. (This Liquidated Damages paragraph is applicable only if initialed by both Parties).**
THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT.  THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE

INITIALS                                                                                           INITIALS
© 2017 AIR CRE.  All Rights Reserved.                                              OFAL 15.00, Revised 01-03-2017

AMOUNT OF ___the Deposit___ . UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.

<div style="text-align:center">Buyer's Initials    Seller's Initials</div>

22.  ARBITRATION OF DISPUTES. (This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)

22.1  ANY CONTROVERSY AS TO WHETHER BUYER IS ENTITLED TO THE LIQUIDATED DAMAGES, OR WHETHER OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. THE NUMBER OF ARBITRATORS SHALL BE AS PROVIDED IN THE COMMERCIAL RULES AND EACH SUCH ARBITRATOR SHALL BE AN IMPARTIAL REAL ESTATE BROKER WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THE ARBITRATOR OR ARBITRATORS SHALL BE APPOINTED UNDER THE COMMERCIAL RULES AND SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, IS RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.

22.2  BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.

22.3  NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THIS FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.

<div style="text-align:center">Buyer's Initials    Seller's Initials</div>

23.  **Miscellaneous.**

23.1  **Binding Effect.** Buyer and Seller both acknowledge that they have carefully read and reviewed this Agreement and each term and provision contained herein. In addition, this Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 and 22 are each incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.

23.2  **Applicable Law.** This Agreement shall be governed by, and paragraph 22.3 is amended to refer to, the laws of the state in which the Property is located. Any litigation or arbitration between the Parties hereto concerning this Agreement shall be initiated in the county in which the Property is located.

23.3  **Time of Essence.** Time is of the essence of this Agreement.

23.4  **Counterparts.** This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.

23.5  **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

23.6  **Conflict.** Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions. **Seller and Buyer must initial any and all handwritten provisions.**

23.7  **1031 Exchange.** Both Seller and Buyer agree to cooperate with each other in the event that either or both wish to participate in a 1031 exchange. Any party initiating an exchange shall bear all costs of such exchange. The cooperating Party shall not have any liability (special or otherwise) for damages to the exchanging Party in the event that the sale is delayed and/or that the sale otherwise fails to qualify as a 1031 exchange.

23.8  **Days.** Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. Notwithstanding the foregoing, if any period set forth herein expires on a day that is not a business day in Los Angeles, California, then such period shall automatically extend to the next business day.

24.  **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

24.1  The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.

24.2  When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:

(a)  *Seller's Agent.* A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) *To the Seller.* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) *To the Buyer and the Seller.* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b)  *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has

INITIALS                   INITIALS

© 2017 AIR CRE. All Rights Reserved.
OFAL-15.00, Revised 01-03-2017

the following affirmative obligations. (1) *To the Buyer.* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) *To the Buyer and the Seller.* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c)    *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d)    *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Buyer and Seller each acknowledge receipt of a disclosure of the possibility of multiple representation by the Broker representing that principal. This disclosure may be part of a listing agreement, buyer representation agreement or separate document. Buyer understands that Broker representing Buyer may also represent other potential buyers, who may consider, make offers on or ultimately acquire the Property. Seller understands that Broker representing Seller may also represent other seller's with competing properties that may be of interest to this Buyer. Brokers have no responsibility with respect to any default or breach hereof by either Party. ~~The express agree that no lawsuit or other legal proceeding involving any alleged duty, error or omission relating to this transaction may be brought against Broker more than one year after the Date of Agreement and that the liability (including court costs and attorneys fees) of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.~~

~~24.3  Confidential Information. Buyer and Seller agree to that identified as Confidential any communication or information given Brokers that is considered by such Party to be confidential.~~

25.    **Construction of Agreement.** In construing this Agreement, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. This Agreement shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

26.    **Additional Provisions.**
Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum or addenda consisting of paragraphs ___28___ through ___34___ . (if there are no additional provisions write "NONE".)

---

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

---

NOTE:
1.    THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.    IF EITHER PARTY IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

Date: June 8, 2018

BROKER

Attn: _____
Title: _____

Address: _____
Phone: _____
Fax: _____
Email: _____

BUYER

Agile Property Group LLC, a Delaware limited liability company

By _____
Name Printed: Daniel J. Weiss
Title: _____
Phone: _____
Fax: _____

INITIALS                    INITIALS

© 2017 AIR CRE. All Rights Reserved.
OFAL-15.00, Revised 01-03-2017

Federal ID No.: _____
Broker/Agent BRE License #: _____

Email: _jwen@metal.com_

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: _100 Bayview Circle, Suite 310_
Federal ID No.: _61-1453699_

**27. Acceptance.**

27.1 Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.

27.2 In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay Brokers a real estate Brokerage Fee in a sum set forth in a separate written agreement ~~equal to _____ % of the Purchase Price to be divided between the Brokers as follows: Seller's Broker _____ % and Buyer's Broker _____ %~~. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.

27.3 Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

**NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.**

Date: _May , 2018_

**BROKER**

_KW Commercial and Packo Investments, Inc._

Attn: _Kirk Garabedian_
Title: _Director_

Address: _889 Americana Way, Suite 430,_
_Glendale, CA 91210_
Phone: _818-432-3200_
Fax: _____
Email: _____
Federal ID No.: _____
Broker/Agent BRE License #: _____

**SELLER**

_Central Metal, Inc., a_
_corporation, and Long Uk Byun, and_
_individual, collectively_

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

By: _____
Name Printed: _____
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: _____
Federal ID No.: _____

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.


INITIALS
© 2017 AIR CRE. All Rights Reserved.

INITIALS

OFAL-15.00, Revised 01-03-2017

ADDENDUM TO STANDARD OFFER, AGREEMENT
AND ESCROW INSTRUCTIONS FOR
PURCHASE OF REAL ESTATE (VACANT LAND) DATED MAY __, 2018
BY AND BETWEEN ALERE PROPERTY GROUP LLC, AS BUYER,
AND CENTRAL METAL, INC. AND LONG UK BYUN, COLLECTIVELY, AS SELLER

28.    The deleted Paragraph 9.1(k) is hereby replaced with the following (which shall be one of Buyer's Contingencies under the Agreement):

"(k)    *Environmental Approval.* It is a condition to Buyer's obligation to purchase the Property that Buyer shall: (1) have fully assessed the environmental condition of the Property; (2) ascertained the scope of environmental remediation needed for the Property pursuant to all applicable federal, state and local laws, rules, and regulations; (3) obtained such written approval(s) and/or assurances regarding the required scope of environmental remediation of the Property from each applicable governmental authority, division, body, agency, commission, board or the like having jurisdiction over the Property (collectively, the "Authorities") as Buyer may require; and (4) be satisfied, in its sole discretion, that the environmental condition of the Property will not impede its development of the Property (collectively, the "Environmental Approval Contingency"). If and when Buyer determines, in its sole discretion, that the Environmental Approval Contingency has been satisfied, Buyer shall deliver notice thereof to Seller. If Buyer determines at any time, in its sole discretion, that it will be unable to develop the Property as it so desires in an economically feasible manner, or is otherwise unable to satisfy the Environmental Approval Contingency, Buyer may elect at any time prior to the expiration of the Environmental Contingency Period (as defined below) to terminate this Agreement. Upon such termination, the Deposit shall be returned to Buyer without further authorization or approval of Seller, and neither Party shall have any further rights, liabilities or obligations with respect to the purchase and sale of the Property. Seller hereby authorizes Buyer to perform, at Buyer's sole cost and expense, such environmental review and testing (including invasive and destructive testing) of the Property as Buyer may deem necessary, and to disclose the results of such tests and the environmental condition of the Property to the Authorities and such other parties as Buyer may deem appropriate. Seller agrees to reasonably cooperate with Buyer in a timely manner in connection with Buyer's efforts to satisfy the Environmental Approval Contingency. Buyer has a period of six (6) months after the expiration of the Due Diligence Period (as defined in Paragraph 9.1(a)) to satisfy itself with regard to the Environmental Approval Contingency (the "Environmental Contingency Period"); provided, however, that if Buyer determines that environmental remediation of the Property is required, Buyer may extend the Environmental Review Period to be a period of twelve (12) months after the expiration of the Due Diligence Period by providing written notice to Seller prior to the expiration of the initial six (6) month Environmental Contingency Period."

29.    The following is hereby added to the Agreement as Paragraph 12.1(m) and shall constitute one of Seller's representations and warranties under the Agreement:

"(m)    *Debt.* Hyundai and other purported secured creditors (collectively, the "Lenders") contend that Seller owes them a total of approximately $27,000,000 (collectively, the "Loan"). It is the intention of Seller to pay off the Loan or otherwise satisfy these claims from the sales proceeds in escrow, although as to any contested claim including most particularly Hyundai, each claim will be either paid off or dealt with in a way so that neither the Loan nor any claims, rights or interests of the Lenders, whether securing the Loan or otherwise, will affect the Property at Closing. Each Lender including Hyundai claims that their respective claims are recorded against the Property. As to Hyundai's claim, Seller contends that Hyundai is unsecured, but will either pay off the Loan or deal with the Hyundai claims in such a way that neither the Loan nor any claims, rights or interests of Hyundai or any other Lenders, whether securing the

INITIALS                                                                        INITIALS

Loan or otherwise, will affect the Property at Closing. Hyundai claims that Seller is in default as to its claims, which Seller contests, however, again, the Hyundai claims will be paid off or dealt with in a manner so that neither the Loan nor any claims, rights or interests of Hyundai or any other Lenders, whether securing the Loan or otherwise, will affect the Property at Closing.

Hyundai contends and Seller denies that Seller is in default under the Loan. Nevertheless, the Lenders have initiated foreclosure proceedings and a trustee's foreclosure sale of the Property (the "Foreclosure Sale") is anticipated to be scheduled for July 16, 2018. Seller hereby authorizes Buyer to disclose and discuss this Agreement with the Lenders and agrees to reasonably cooperate with Buyer in any efforts by Buyer to cause the Lenders to recognize this Agreement and forbear from exercising its remedies with respect to the Loan while this Agreement remains in effect. Seller shall deliver to Buyer any notices it receives from any of the Lenders with respect to the Loan within two (2) business days after receipt. Notwithstanding anything in this Agreement to the contrary, no time periods applicable to Buyer's review and inspection of the Property shall commence until the date on which the conditions set forth in (A) and (B) have occurred (the "Forbearance Date"): (A) Buyer has received (i) a fully executed copy of a forbearance agreement from Lenders with respect to the Loan which provides that Lenders will postpone the Foreclosure Sale and forbear from exercising any remedies against Seller until after Closing and release any claims, rights or interests they have in the Property at Closing, or such other agreement with Lenders as may be acceptable to Buyer and Seller (a "Forbearance Agreement") or (ii) a copy of a Court Order enjoining Lenders from proceeding with the Foreclosure Sale until after Closing, together with confirmation that the Lenders will release any claims, rights or interests they have in the Property at Closing (an "Order"); and (B) Buyer provides written notice to Seller that the Forbearance Agreement or Order is acceptable to Buyer. In the event a Forbearance Agreement or an Order has not been obtained by July 10, 2018, either Seller or Buyer may elect to terminate this Agreement by providing written notice to the other party on or before July 15, 2018; provided, however, that Buyer shall also have the right to terminate this Agreement at any time prior to the Forbearance Date for any reason in its sole discretion or at any time after July 15, 2018 if the Forbearance Date has not occurred. Upon any termination of this Agreement, the Deposit shall be returned to Buyer without further authorization or approval of Seller, and neither Party shall have any further rights, liabilities or obligations with respect to the purchase and sale of the Property. Buyer and Seller acknowledge and agree that Seller has no obligation to proceed with the transaction contemplated by this Agreement and may terminate this Agreement after July 10, 2018 if (x) Seller and the Lenders do not enter into a Forbearance Agreement with terms acceptable to Seller, including, if required by Seller, a discount on the amounts owed to the Lenders that is acceptable to Seller in its sole and exclusive discretion and (y) an Order has not been issued. Seller agrees to use diligent and good faith efforts to enter into an acceptable Forbearance Agreement with the Lenders or obtain an Order on or before July 10, 2018. "

30.    From the Date of Agreement through the date of Closing, Seller agrees as follows: (a) Seller will manage and maintain the Property in substantially the same manner as it operated the Property prior to the Date of Agreement; (b) Seller will keep in full force and effect all existing insurance policies which are presently in effect for the Property, or any portion of the Property; (c) Seller shall give Buyer prompt notice of the institution of any litigation, arbitration or administrative proceeding of which it becomes aware prior to the date of Closing involving Seller or the Property; (d) Seller will not take, permit, cause, encourage or acquiesce to any action or omission to act that would result in any of Seller's representations or warranties in this Agreement becoming false, and (e) as soon as reasonably practicable after Seller obtains actual knowledge, but in any event within five (5) days thereafter, Seller shall notify Buyer in writing (a "Correction Notice") of any material inaccuracy of any of Seller's representations and warranties set forth in the Agreement, including Paragraph 12.1. If Buyer receives any Correction Notice after expiration of Buyer's Contingencies, Buyer shall allow Seller a period of ten (10) days to cure the inaccuracy that caused such Correction Notice, and if such cure is not effected within such cure period,

INITIALS                                                                                      INITIALS

Buyer shall have a period of five (5) days after expiration of such cure period during which, in Buyer's sole discretion, Buyer may terminate this Agreement by written notice to Seller, whereupon the Deposit and accrued interest thereon shall promptly be returned to Buyer. At Closing, Seller shall be deemed to represent and warrant to Buyer that Seller has fully performed and complied with all of its covenants in this Agreement, which representation and warranty shall be deemed to be incorporated into Paragraph 12.1 of this Agreement.

31.    Seller must first obtain the prior written consent of Buyer in each instance to take any of the following actions during the period between the Date of Agreement and the date of Closing: (a) modifying the Property or removing any portion of the Property, including, without limitation, removing any part of any improvements or any soil from the Property; (b) entering into any leases or occupancy agreements for the Property; (c) entering into any service contract or entering into any employment, maintenance, service, supply or other agreement relating to the Property; (d) granting or otherwise creating or consenting to the creation of any easement, restriction, lien, assessment or encumbrance respecting the Property; and (e) executing any documents required for the development of the Property.

32.    BUYER HEREBY REPRESENTS, WARRANTS, ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, (I) BUYER IS PURCHASING THE PROPERTY BASED SOLELY UPON BUYER'S INSPECTION AND INVESTIGATION OF THE PROPERTY AND ALL DOCUMENTS RELATED THERETO, OR ITS OPPORTUNITY TO DO SO, AND (II) BUYER IS PURCHASING THE PROPERTY IN AN "AS IS" CONDITION, WITHOUT RELYING UPON ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND, EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES OF SELLER CONTAINED IN PARAGRAPH 12. WITHOUT LIMITING THE ABOVE, BUYER ACKNOWLEDGES THAT SELLER, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, HAS NOT MADE ANY REPRESENTATIONS OR WARRANTIES ON WHICH BUYER IS RELYING AS TO ANY MATTERS CONCERNING THE PROPERTY AND BUYER REPRESENTS AND AGREES THAT SELLER SHALL NOT HAVE ANY LIABILITY, OBLIGATION OR RESPONSIBILITY WITH RESPECT TO THE CONTENT OR ACCURACY OF ANY REPORT, STUDY, OPINION OR CONCLUSION OF ANY SOILS, TOXIC, ENVIRONMENTAL OR OTHER ENGINEER OR OTHER PERSON OR ENTITY WHO HAS EXAMINED THE PROPERTY OR BUYER'S INTENDED USE THEREOF AND/OR THE CONTENT OR ACCURACY OF ANY DOCUMENT OR OTHER MATERIAL DELIVERED TO BUYER PURSUANT TO BUYER'S REVIEW OF THE CONDITION OF THE PROPERTY.

(a)    TO THE EXTENT REQUIRED TO BE OPERATIVE, THE DISCLAIMERS OR WARRANTIES CONTAINED HEREIN ARE "CONSPICUOUS" DISCLAIMERS FOR PURPOSES OF ANY APPLICABLE LAW, RULE, REGULATION OR ORDER.

(b)    NOTWITHSTANDING ANYTHING IN THIS PARAGRAPH 32 TO THE CONTRARY, NOTHING IN THIS AGREEMENT IS INTENDED TO AND DOES NOT RELEASE SELLER FROM (I) ANY CLAIMS ARISING FROM A BREACH OF SELLER'S REPRESENTATIONS AND WARRANTIES SET FORTH IN PARAGRAPH 12 OF THIS AGREEMENT, OR (II) THE OBLIGATIONS OF SELLER THAT EXPRESSLY SURVIVE THE CLOSING.

(c)    Buyer hereby RELEASES AND DISCHARGES Seller from all claims Buyer may have against Seller relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the Date of Agreement, including all claims Buyer may have against Seller under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. Sections 9601 et seq.), as amended ("CERCLA"), regarding the condition, valuation, salability or utility

INITIALS                                                                                               INITIALS

of the Property, or its suitability for any purpose whatsoever (including, but not limited to, with respect to the presence in the soil, air, structures and surface and subsurface waters, of hazardous substances or other materials or substances that have been or may in the future be determined to be toxic, hazardous, undesirable or subject to regulation and that may need to be specially treated, handled and/or removed from the Property under current or future federal, state and local laws, regulations or guidelines ("Hazardous Substances"), and any structural and geologic conditions, subsurface soil and water conditions and solid and hazardous waste and Hazardous Substances on, under, adjacent to or otherwise affecting the Property). Buyer further hereby WAIVES (and by Closing this transaction will be deemed to have WAIVED) any and all claims Buyer may have against Seller (including, but not limited to, federal, state and local statutory and common law based actions, and any private right of action under any federal, state or local laws, regulations or guidelines to which the Property is or may be subject, including, but not limited to, CERCLA) concerning the physical characteristics and any existing conditions of the Property, including, without limitation, relating to the physical, environmental or legal compliance status of the Property, whether arising before or after the Date of Agreement. Notwithstanding the foregoing, the release and discharge set forth in this paragraph shall not apply to claims arising during the Possession Period pursuant to Paragraph 33.

BUYER EXPRESSLY WAIVES THE BENEFITS OF CALIFORNIA CIVIL CODE SECTION 1542 (THE "SECTION 1542 WAIVER"), WHICH PROVIDES AS FOLLOWS:

INITIALS

INITIALS

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR EXPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

_____
Buyer's initials

     33.     Buyer agrees that Seller may continue to occupy the Property for a period of sixty (60) days after the date of Closing (the "Possession Period"), upon and subject to the terms and conditions set forth in this Paragraph 33. Except as set forth herein, Seller shall have no obligation to pay rent or to reimburse Buyer for fees applicable to the Property during the Possession Period. Seller agrees that any personal property and equipment stored or located on the Property shall be at the sole risk of Seller with respect to any loss, theft or damage and if not removed from the Property upon the expiration of the Possession Period shall be deemed to be conveyed to Buyer by bill of sale. On or before the expiration of the Possession Period, Seller shall vacate the Property and cause any other occupants to vacate the Property. If Seller fails to do so, Seller shall be obligated to pay to Buyer $1,000.00 (plus any other damages incurred by Buyer) for each day of occupancy of the Property by Seller or any other occupants after the expiration of the Possession Period up to and including the day upon which the Property is vacated by Seller and any other occupants, and Buyer shall have all rights and remedies at law and equity (including the right to evict or dispossess Seller from the Property) with respect to such unlawful occupancy of the Property after the expiration of the Possession Period. At all times during the Possession Period and any holdover by Seller or any other occupants Seller permits to occupy the Property, Seller shall maintain on the Property an insurance policy insuring against liability for bodily injury, including death, and property damage, and Buyer shall be permitted to enter onto the Property upon prior notice to Seller. Seller agrees to defend, indemnify and hold Buyer harmless from and against any and all damage, losses, claims, demands, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) incurred by Buyer arising out of or in connection with the occupancy of the Property after Closing by Seller or any other occupants Seller permits to occupy the Property. The terms of this paragraph shall survive the Closing.

     34.     In the event of conflict or inconsistency between the provisions of this Addendum and the provisions of the Agreement to which it is attached, the provisions of this Addendum shall control.

_____
INITIALS

_____
INITIALS

## JOINDER BY ESCROW HOLDER

Escrow Holder has executed this Agreement in order to confirm that Escrow Holder has received the Deposit and Escrow Holder shall hold the Deposit and the interest earned thereto, in escrow, and shall disburse the Deposit, and the interest earned thereon, pursuant to the provisions of this Agreement.

Date executed by Escrow Holder:        **FIRST AMERICAN TITLE**
                                       **INSURANCE COMPANY**

May __, 2018                           By: _____
                                       Name: _____
                                       Title: _____



INITIALS                                                          INITIALS

 *First American Title Insurance Company National Commercial Services*
*3281 E Guasti Road, Suite 440 Ontario, CA 91761*

| | | |
|---|---|---|
| PR: NATLAC    Ofc: 30 (1602) | **DATE:** | 06/12/2018 |
| | **RECEIPT NO.:** | 3033285 |
| **RECEIPT FOR DEPOSIT** | **FILE NO.:** | NCS-911032-ONT1 |

**FUNDS IN THE AMOUNT OF:** $500,000.00

**WERE RECEIVED FROM:** Alere Property Group, LLC

**CREDITED TO THE ACCOUNT OF:** Buyer

**TYPE OF DEPOSIT:** Wire          **REPRESENTING:** Initial Deposit

**Comments:**

**Property Location:** 8201 Santa Fe Road, Huntington Park, CA

**BY:** Christina Corral, 06/12/2018

**ESCROW OFFICER:** Kelly Simoneau

"The validity of this receipt, for the deposit referenced,
is subject to clearance by the depository financial institution and credit to our account."

File Copy

# Incoming Wire – Details Report

**Status:** Pending

File Number:

**$500,000.00**

|  |  |
|---|---|
| Account: | 3016020000 |
| PayMeth: | FED |
| IN/OUT: | INBOUND |
| MSGID: | FTR811 |
| TYPE: | WIRE TRANSFER CREDIT |
| REF: | 20181630726600 |
| IMAD: | 20180612L1LF994C001421 |
| OMAD: | 20180612L1B78J1C00236406121550FT03 |
| SNDBKABA: | 121137522 |
| SNDBKNAME: | COMERICA SCO VLY |
| RCVBKABA: | 122241255 |
| RCVBKNAME: | FST AM TR CO SANA |
| ORGID: | 1894902780 |
| ORG: | ALERE PROPERTY GROUP LLC100 BAYVIEW CIRCLE STE 310 NEWPORT BEACH, CA 92660 |
| OGB: | |
| BNF: | 3016020000FIRST AMERICAN TITLE COMPANY NATION |
| OBI: | FILE NO 911032 8201 SANTA FE ROAD HUNTINGTON PARK CA |
| RCVBKINFO: | |
| IBKINFO: | |
| BBKINFO: | |
| BNFINFO: | |
| BBI: | |
| RFB: | 17739789 |
| CREATE OPERATOR: | FED |
| VERIFY OPERATOR: | none |
| PNRM TIME: | 06/12/2018 12:50:10 |
| Business Function Code: | CTR |

### JOINDER BY ESCROW HOLDER

Escrow Holder has executed this Agreement in order to confirm that Escrow Holder has received the Deposit and Escrow Holder shall hold the Deposit and the interest earned thereto, in escrow, and shall disburse the Deposit, and the interest earned thereon, pursuant to the provisions of this Agreement.

Date executed by Escrow Holder:

~~May~~ 12, 2018

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____

Name: Kelly Simoneau

Title: Senior Commercial Escrow Officer
National Commercial Services

INITIALS

INITIALS

1

### DECLARATION OF GIOVANNI ORANTES

2      I, Giovanni Orantes, hereby declare and state as follows:

3      1.      I am over the age of eighteen years and am not a party to this action; my business

4 address is 3435 Wilshire Blvd. Suite 2920, Los Angeles, CA 90010, in Los Angeles County,

5 California. I am duly licensed member of the bar of this Court. I have personal knowledge of the

6 foregoing facts and if I am called upon to testify I could and would do so competently thereto.

7      2.      I make this declaration pursuant to the Court's Order: (1) Setting Conference On

8 Status Of Reorganization Case; (2) Requiring Debtors-In-Possession To Appear At Status

9 Conference And File Report On Status Of Reorganization Case, Or Face Possible (A) Conversion

10 Of Case To Chapter 7; (B) Dismissal Of Case; Or (C) Appointment Of Trustee; (3) Requiring

11 Compliance With Standards Re Employment And Fee Applications; (4) Giving Notice Of Probable

12 Use Of Court-Appointed Expert Witness For Contested Valuation Requests; (5) Mandating Use Of

13 Forms For Disclosure Statement And Plan; And (6) Establishing Procedure For (A) Motion For

14 Order Approving Adequacy Of Disclosure Statement; And (B) Motion For Order Confirming Plan;

15 Status Conference hearing to be held on October 22, 2020 at 9:30 a.m.

16      3.      Attached hereto as Exhibit "1" is a true and correct copy of my <u>estimated</u> budget for

17 this case.

18      ### DEBTOR HAS PERFORMED ALL DUTIES UNDER 11 U.S.C. §§ 521, 1106 AND 1107

19      4.      The Debtor has performed all his duties under 11 U.S.C. §§ 521, 1106 and 1107.

20      ### PROFESSIONALS

21      5.      At this time, the Debtor has only hired The Orantes Law Firm, P.C. ("the "Firm"),

22 as his general insolvency counsel.  The Firm's employment application was filed on September 4,

23 2020 as Docket No. 36. On September 29, 2020, the Court entered that Order Granting Motion in

24 Individual Chapter 11 Case to Authorize Debtor-in-Possession to Employ General Counsel

25 (Docket No. 58).

26      6.      The Debtor will be filing an application to employ a professional other than

27 general bankruptcy counsel for Hyoung Jin Park (CPA) for the Debtor's accounting needs.

28

**PROPOSED BAR DATE AND DEADLINE FOR CLAIM OBJECTIONS**

7.    The Debtor requests that the Court issue a deadline to file proof of claims. Deadline should be December 15, 2020.  The Debtor does not request that a deadline to have objections to claims be set.

**TIMING FOR FILING OF PLAN AND DISCLOSURE STATEMENT**

8.    Again, the Debtor can file his Disclosure Statement and Plan soon after the claims bar date expires, but may file it sooner, if possible. The Debtor believes that there will be a distribution to general unsecured creditors in this case.

9.    The Debtor intends to strive diligently to reorganize his financial affairs as expeditiously as possible and hopes to have his plan of reorganization confirmed as expeditiously as possible.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of October 2020, at Los Angeles, CA.

/s/ Giovanni Orantes
Giovanni Orantes

# Exhibit "1"

**Jong Uk Byun**

Categories of Services

Category:    Asset Recovery/Analysis/Disposition

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 25 | $ 12,500.00 |
| Paralegals | $ 160.00 | 25 | $ 4,000.00 |
| Total | | | $ 16,500.00 |

Category:    Business Operations

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 12 | $ 6,000.00 |
| Paralegals | $ 160.00 | 4 | $ 640.00 |
| Total | | | $ 6,640.00 |

Category:    Case Administration

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 20 | $ 10,000.00 |
| Paralegals | $ 160.00 | 20 | $ 3,200.00 |
| Total | | | $ 13,200.00 |

Category:    Claims Administration and Objections/Litigation

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 45 | $ 22,500.00 |
| Paralegals | $ 160.00 | 20 | $ 3,200.00 |
| Total | | | $ 25,700.00 |

Category:    Fee/Employment Applications/Objections

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 12 | $ 6,000.00 |
| Paralegals | $ 160.00 | 18 | $ 2,880.00 |
| Total | | | $ 8,880.00 |

Category:    Automatic Stay

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 25 | $ 12,500.00 |
| Paralegals | $ 160.00 | 25 | $ 4,000.00 |
| Total | | | $ 16,500.00 |

**Category:**                  **Plan and Disclosure Statement**

| Name and or/Type | Hourly Rate ($/hr) | Estimated # of Hours | Total ($) Estimate |
|---|---|---|---|
| Giovanni Orantes, Esq. | $ 500.00 | 45 | $ 22,500.00 |
| Paralegals | $ 160.00 | 25 | $ 4,000.00 |
| Total | | | $ 26,500.00 |

| | | | |
|---|---|---|---|
| Total Estimated Fees | | | $ 113,920.00 |

**Expenses (Estimate)**

| | |
|---|---|
| Document Reproduction (@ $0.10/page) | $6,000.00 |
| Facsimile Charges (@ $0.10/page for receipt only) | $50.00 |
| Postage | $6,000.00 |
| Total | $12,050.00 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**3435 Wilshire Blvd., Suite 2920**
**Los Angeles, CA 90010**

A true and correct copy of the foregoing document entitled (*specify*): **Chapter 11 Status Report;
Supporting Declarations** will be served or was served **(a)** on the judge in chambers in the form and
manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.
On **10/08/2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses
stated below:

Theron S Covey on behalf of Creditor Deutsche Bank National Company
tcovey@rasflaw.com

M. Jonathan Hayes on behalf of Interested Party Courtesy NEF
jhayes@rhmfirm.com, roksana@rhmfirm.com;matt@rhmfirm.com;janita@rhmfirm.com;susie@rhmfirm.com;prisci
lla@rhmfirm.com;pardis@rhmfirm.com;russ@rhmfirm.com;rebeca@rhmfirm.com;david@rhmfirm.com;sloan@rh
mfirm.com

Evan M Jones on behalf of Creditor Hyundai Steel Company
ejones@omm.com, ejones@omm.com

David W. Meadows on behalf of Interested Party Courtesy NEF
david@davidwmeadowslaw.com

Kelly L Morrison on behalf of U.S. Trustee United States Trustee (LA)
kelly.l.morrison@usdoj.gov

Giovanni Orantes on behalf of Debtor Jong Uk Byun
go@gobklaw.com, gorantes@orantes-
law.com,cmh@gobklaw.com,gobklaw@gmail.com,go@ecf.inforuptcy.com;orantesgr89122@notify.bestcase.com

Valerie Smith on behalf of Interested Party Courtesy NEF
claims@recoverycorp.com

United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On **10/08/2020**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first
class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the
judge **will be completed** no later than 24 hours after the document is filed.

**Hon. Judge Vincent Zurzolo**
**United States Bankruptcy Court**
**255 E. Temple Street, Suite 1360 / Courtroom 1368**
**Los Angeles, CA 90012**

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| **October 8, 2020** | Omar Amaya | |
| *Date* | *Printed Name* | *Signature* |

# Top 20 unsecured Creditors

| | |
|---|---|
| Adv. Fin./grand Pacific<br>5900 Pasteur Ct Ste 200<br>Carlsbad, CA 92008 | Bejac<br>569 S. Van Buren Street<br>Placentia, CA 92870 |
| DTSC- Site Clean Up Program<br>Po Box 806<br>Sacramento, CA 95812 | California Dept. of Tax and Fee Adm<br>Special Ops. MIC 55<br>Sacramento, CA 94279 |
| Complete Business Solutions Group<br>C/o Joe Cole<br>20 N. 3rd St.<br>Philadelphia, PA 19106 | Bok Sook Byun<br>c/o Steven Polard<br>1880 Century Park East, Ste. 404<br>Los Angeles, CA 90067 |
| Eisner Jaffe<br>9601 Wilshire Blvd., 7th Fl.<br>Beverly Hills, CA 90210 | Daniel Park<br>3435 Wilshire Blvd. Ste. 2700<br>Los Angeles, CA 90010 |
| Wells Fargo Dealer Services<br>Attn: Bankruptcy<br>1100 Corporate Center Drive<br>Raleigh, NC 27607 | Sequoia Financial Svcs<br>Attn: Bankruptcy<br>28632 Roadside Dr , Ste 110<br>Agoura Hills, CA 91301 |
| Joan Park<br>c/o Daniel Park<br>3435 Wilshire Blvd., # 2700<br>Los Angeles, CA 90010 | Jourdain DeWard<br>c/o Daniel Park<br>3435 Wilshire Blvd. # 2700<br>Los Angeles, CA 90010 |
| Resnik Hayes Moradi LLP<br>17609 Ventura Blvd, Ste 314<br>Encino, CA 91316-5132 | Jinah Oh<br>21856 S. Vermont Ave., #6<br>Torrance, CA 90502 |
| Creditors adjustment<br>14226 Ventura Blvd.<br>Sherman Oaks, CA 91423 | Bmw Bank Of North Amer<br>Attn: Bankruptcy<br>Po Box 3608<br>Dublin, OH 43016 |
| Cemex Construction Materials<br>1430 East Santa Clara Street<br>Santa Paula, CA 93060 | Hose- Man<br>5397 North Irwindale Ave<br>Baldwin Park, CA 91706 |
| DL1 Assets Bravo, LLC<br>Parker, Simon & Kokolis, LLC<br>110 N. Washington Street,<br>Ste. 500<br>Rockville, MD 20850 | Deutsche Bank National Trust Co.<br>c/o Ocwen Loan Servicing, LLC<br>Attn: Bankruptcy Dept.<br>PO Box 24605<br>West Palm Beach, FL 33416-4605 |

# Secured Creditors

| | |
|---|---|
| Adv. Fin./grand Pacific<br>5900 Pasteur Ct Ste 200<br>Carlsbad, CA 92008 | Allen Park<br>440 S. Vermont Ave. Ste. 301<br>Los Angeles, CA 90010 |
| Bank of America<br>Attn: Bankruptcy<br>4909 Savarese Circle<br>Tampa, FL 33634 | Complete Business Solutions Group<br>C/o Joe Cole<br>20 N. 3rd Street<br>Philadelphia, PA 19106 |
| Bank of Hope<br>C/o Frandzel Robins Bloom & Csato<br>Attn: Hal D. Goldflam<br>1000 Wilshire Blvd., 19th Fl.<br>Los Angeles, CA 90017 | Hyundai Steel Company<br>c/o O'Melveny & Myers LLP<br>Attn: Darren Patrick<br>400 S. Hope Street, 18th Fl.<br>Los Angeles, CA 90071 |
| Los Angeles County Tax Collector<br>Bankruptcy Unit<br>Po Box 54110<br>Los Angeles, CA 90054-0110 | M&A Equitiies, LLC<br>C/o Allen Park<br>440 S. Vermont Ave., Ste. 301<br>Los Angeles, CA 90010 |
| Packo Investments<br>C/o Allen Park<br>440 S. Vermont Ave., Ste. 301<br>Los Angeles, CA 90020 | San Bernardino County Tax Collector<br>Attn: Director or Executive Officer<br>172 West Third St., First Floor<br>San Bernardino, CA 92415-0360 |
| Soo Yeong Kim<br>Yeon Shim Song<br>8300 Santa Fe Ave<br>Huntington Park, CA 90255 | Soo Yeong Kim<br>C/o J.J. Kim & Associates, P.C.<br>9252 Graden Grove Blvd., Suite 23<br>Garden Grove, CA 92844 |
| Toni Ko<br>1100 S. Hope Street<br>Los Angeles, CA 90015 | Toni Ko<br>C/o Shirley S. Cho, Esq.<br>10100 Santa Monica Blvd., 13th Fl<br>Los Angeles, CA 90067 |
| Wells Fargo Dealer Services<br>Attn: Bankruptcy<br>1100 Corporate Center Drive<br>Raleigh, NC 27607 | Yeon Shim Song<br>C/o J.J. Kim & Associates<br>9252 Garden Grove Blvd., Ste. 23<br>Garden Grove, CA 92844 |
| Complete Business Solutions Group<br>Attn: President or Corp. Officer<br>141 N. 2nd St.<br>Philadelphia, PA 19106 | Hyundai Steel Company<br>c/o Taejoong Kim<br>10550 Talbert Ave., Fl 2<br>Fountain Valley, CA 92708 |
| Soo Yeong Kim<br>Yeon Shim Song<br>8300 Santa Fe Ave<br>Huntington Park, CA 90255 | Toni Ko<br>C/o Fox Rothschild, LLP<br>345 California St., Suite 2200<br>San Francisco, CA 94104 |

| | |
|---|---|
| Richard A. Marschack (TR)<br>870 Roosevelt<br>Irvine, CA 92620 | Richard A. Marschack<br>C/o Goe Forsythe & Hodges LLP<br>18101 Von Karman Ave., Suite 1200<br>Irvine, CA 92612 |
| Bae Family Trust<br>C/o Young U. Bae<br>C/o Packo Investments, Inc.<br>440 S. Vermont Ave. #301<br>Los Angeles, CA 90020 | BFS West, Inc.<br>C/o King & Associates<br>Attn: President or Corp. Officer<br>13 Corporate Plaza, Suite 200<br>Newport Beach, CA 92660 |
| Kap Chan Chong<br>C/O Christine Chong, Esq.<br>3580 Wilshire Blvd., Ste. 900<br>Los Angeles, CA 90010 | Mohamed Sanfaz<br>C/o Packo Invvestments, Inc.<br>440 S. Vermont Ave., Ste. 301<br>Los Angeles, CA 90020 |
| Select Portfolio Servicing, Inc<br>Attn: Bankruptcy<br>Po Box 65250<br>Salt Lake City, UT 84165 | Southern Counties Oil, Co.<br>1800 W. Katella Ave., Ste. 400<br>Orange, CA 92867 |
| Wells Fargo Bank NA<br>Attn: Bankruptcy<br>Po Box 10438<br>Des Moines, IA 50306 | BFS West, Inc.<br>Attn: President or Corp. Officer<br>3301 University<br>Pompano Beach, FL 33065 |
| L. Peter Ryan<br>Fox Rothschild, LLP<br>345 California Street, Ste. 2200<br>San Francisco, CA 94104 | Wilshire State Bank<br>3200 Wilshire Blvd<br>Los Angeles, CA 90010 |
| United States Trustee<br>915 Wilshire Blvd., Ste. 1850<br>Los Angeles, CA 90017 | San Bernardino County<br>Collections Unit<br>825 East Hospitality Lane, First Fl.<br>San Bernardino, CA 92415-0914 |